**In re Moazma Z. SYED, Debtor.**

**Bankruptcy No. 99 B 00245.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

May 13, 1999.

Anthony E. Simpkins, Assistant Corporation Counsel, Chicago, IL, for Movant.

John D. Noland, Forrest L. Ingram, Chicago, IL, for Respondent.

Craig Phelps, Chicago, IL, Chapter 13 Trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

Following trial held on the Motion of City of Chicago ("City") under 11 U.S.C. § 362(d) to modify or annul the automatic stay, the Court now makes and enters these Findings of Fact and Conclusions of Law:

#### Findings of Fact

1. The Debtor, Moazma Z. Syed, filed her individual, voluntary petition under Chapter 13 of the U.S. Bankruptcy Code on January 6, 1999.

2. The Debtor is the current record owner of property commonly known as 3333–37 West Washington Street in Chicago, Illinois, a 10–story, 77–unit, residential

rental building ("premises"), listed as the only real property and asset in her Bankruptcy Petition (Schedule A), filed under Chapter 13 of the Bankruptcy Code, Title 11 U.S.C.

3. The Debtor first obtained title to the premises by quitclaim deed dated November 14, 1994, and recorded as document no. 97–048151 with the Cook County Recorder of Deeds on January 22, 1997.

4. On September 9, 1997, the Debtor transferred her record interest in the premises to Shafqat H.K. Syed, by quitclaim deed recorded as document no. 97673798 with the Cook County Recorder of Deeds on September 9, 1997, but she continued to manage and operate the premises.

5. On January 4, 1999, the Debtor again obtained title to the premises from the then record owner, the New Chatfield Corporation, a corporation wholly owned by the Debtor, by quitclaim deed recorded as document No. 99005841 on January 5, 1999, with the Cook County Recorder of Deeds.

6. The City of Chicago is an Illinois municipal corporation and, pursuant to Article VII of the Illinois Constitution, is a home rule unit of local government, authorized and empowered to "regulate for the protection of the public health, safety, morals, and welfare." Ill. Const. Art. VII § 6(a). The City is specifically authorized to regulate the safety of buildings pursuant to Chapter 65 of the Illinois Compiled Statues (ILCS), § 5/11–13–1, 5/11–31–2, and 5/11–31–15 (1996).

7. The premises, through successive owners, has been maintained in a consistent state of disrepair. As a result, starting in 1992 it became the subject of four Housing Court cases filed by the City in the Circuit Court of Cook County, Illinois, over several years. The City petitioned therein for appointment of receivers for the premises, and receivers were appointed by state court order in the several of those cases to effect emergency repair and rehabilitation of certain dangerous and hazardous conditions at the premises. Receiver's certificates were issued in each such case in an aggregate principal amount of $65,937.36.

8. On March 11, 1994, the City filed the case *City of Chicago v. David C. Canan, et. al.*, case no. 94–CH–2302, against the premises to foreclose the aforementioned City's liens that arose by reason of the receiver's certificates.

9. On December 2, 1997, the City obtained a judgment of foreclosure on its said liens and for sale of the premises in 94–CH–2302 to satisfy the liens them amounting to a total of $79,672.00.

10. Prior to entry of the foreclosure judgment, delinquent property taxes for the premises for years 1994 and 1995 were purchased on August 14, 1997, by a Mr. Tony Bryant for a bid of $250.00. . A Certificate of Purchase, No. 97S–0007950, was issued in the name of Tony Bryant on October 3, 1997.

11. The period of redemption for Certificate of Purchase No. 97S–0007950 expired on June 11, 1998. On or about June 5, 1998, subsequent to entry of judgment of foreclosure in favor of the City of Chicago, Tony Bryant filed a petition for issuance of a tax deed for the premises in case no. 98–COTDS–1391.

12. The total amount of outstanding and delinquent real estate taxes for the premises is approximately $298,857.00.

13. On July 15, 1998, in case no. 97–M1–404185, the City was forced to exercise its police powers to effect the emergency evacuation of all remaining tenants and occupants of the premises due to numerous and imminently dangerous defective conditions at the premises which then directly threatened the life and safety of residents.

14. The premises currently remains entirely vacant and in possession of the Debtor, Ms. Syed. It remains in a dilapidated condition, in need of extensive re-

pair. The premises is a blight on the surrounding community.

15. On July 21, 1998, a judge of the Circuit Court of Cook County entered an order of permanent injunction affecting the premises and its ownership and management that, *inter alia,* prohibited it from being leased or occupied until all Chicago Building Code violations at the site are repaired, and until further order of court.

16. On January 6, 1999, a public foreclosure sale of the premises was held, pursuant to the aforementioned judgment of foreclosure in case No. 94 CH 2302. The Debtor, however, had on January 4, 1999, obtained title to the premises again by quitclaim deed two days before she filed the instant voluntary petition for Chapter 13 Bankruptcy on the same day as the public sale set for the premises, and she caused notice of the same to be delivered to the foreclosure selling officer. The public sale of the premises was adjourned upon receipt of notice of the bankruptcy filing.

17. Thereafter, on January 6, 1999, counsel for the City examined the public records of the Cook County Recorder of Deeds, but did not find evidence of the January 4, 1999, quitclaim deed to the Debtor. The public records still indicated only that Ms. Syed had transferred her interest in the premises to Shafqat H.K. Syed on September 7, 1997. Finding ¶ 4.

18. On January 6, 1999, counsel for the City examined the files for the Debtor's Chapter 13 case at the office of the Clerk of the Bankruptcy Court for the Northern District of Illinois, and found no schedules listing the premises as an asset of the bankruptcy.

19. The Debtor did not file her bankruptcy schedules listing her income and showing the premises as her asset until February 18, 1999.

20. As a result, counsel for the City reasonably believed that the Debtor's bankruptcy and the automatic stay arising therefrom was inapplicable to the subject premises, and caused the public foreclosure sale to be recommenced on January 22, 1999, at which sale the City of Chicago was the successful bidder.

21. On February 25, 1999, counsel for the City learned for the first time of the January 4, 1999, quitclaim deed by the New Chatfield Corporation, reconveying the premises to the Debtor (Finding ¶ 5), and they halted the City's efforts to obtain a court order confirming the foreclosure sale in the Circuit Court of Cook County. The City filed its motion here to modify or annul the automatic stay under 11 U.S.C. § 362(d), on March 11, 1999.

22. The Debtor obtained a quitclaim deed to the premises from her own corporation on the eve of the foreclosure sale, and filed on the same day as the sale a personal bankruptcy in which she later scheduled the subject premises as the only asset of her bankruptcy estate. These acts are inferred by the Court to have been a last ditch effort to foil public sale of the premises conducted pursuant to the state court judgment of foreclosure.

23. The Debtor's act of obtaining a quitclaim deed to the premises on the eve of the foreclosure sale, and her delay in filing schedules listing the premises as an asset of the bankruptcy estate until February 18, 1999, obstructed or delayed the City's inquiry into whether or not the automatic stay was applicable to the sale of the premises.

24. The City's act of conducting a post-bankruptcy foreclosure sale of the premises January 22, 1999, was an innocent violation of the automatic stay imposed by 11 U.S.C. § 362(a), undertaken without knowledge that the automatic stay applied to prohibit sale of the premises, and after adequate and reasonable inquiry into whether or not the stay did, in fact, apply to the premises.

25. No evidence demonstrated whether or not the Debtor has equity in the premises.

26. The City moved for an order modifying or annulling the automatic stay for cause under 11 U.S.C. § 362(d).

27. The Debtor answered the City's motion alleging that her reorganization plan provides for fully paying the City's lien, paying the real estate taxes, and rehabilitating the premises, all through payments of $10,000.00 per month beginning September 1, 1999, when she projects that the premises will be fully rehabilitated and occupied by tenants.

28. The ultimate issue presently before the Court, therefore, is whether the premises will generate at least $10,000.00 per month in net income by September 1, 1999, and the plan can thereby be successfully confirmed within a reasonable amount of time. Whether or not the Debtor can successfully rehabilitate and fully rent the premises within that time as required under her plan must be resolved to decide that issue.

29. The Debtor, Moazma Syed, and Zia Gilani testified concerning the availability of funds to rehabilitate the premises, pay the City's foreclosure lien, and pay outstanding and currently accruing real estate taxes, as well as estimates on the income and expenses of the property should it be rehabilitated and occupied. The parties stipulated that Joan de Souza of Pacific Phoenix Group, L.L.C., if called, would testify that Pacific Phoenix was ready to make available to the Debtor loans in the amount of $292,000.00.

30. At the hearing on the City's motion to modify or annul the automatic stay, the following expert witnesses were qualified and testified: Paul Algbokhan, owner of CND Investment & Real Estate Management, Inc., testified for the Debtor as an expert witness regarding the repairs necessary to rehabilitate the building sufficiently for occupancy under the City of Chicago Municipal Code; William J. McMahon, Rehabilitation Construction Specialist with the City of Chicago Department of Housing testified as an expert witness for the City as to the estimated cost of repairs necessary to rehabilitate the building; Frank Fuscaldo, City of Chicago Building Inspector, testified as an expert for the City on carpentry and masonry repairs necessary to rehabilitate the building sufficiently for occupancy; Jonathan Brennan, City of Chicago Plumbing Inspector testified as an expert for the City on plumbing repairs necessary to rehabilitate the building sufficiently for occupancy; and Jose Ovalle, City of Chicago Electrical Inspector, testified as an expert for the City on electrical repairs necessary to rehabilitate the building sufficiently for occupancy.

31. There was no evidence presented of measurable deterioration in value of the City's liens totaling approximately $85,000.00 in the premises adjudicated in the judgment of foreclosure, although the value of the City's said interest will certainly deteriorate over some period unless the premises are rehabilitated.

32. There was no evidence presented concerning whether value of the premises is depreciating or whether it has hit rock bottom value in its present condition.

33. There was no evidence presented concerning the income of Debtor other than the schedules I and J filed by the Debtor in this case on February 16, 1999, and no evidence presented that the Debtor had income available to contribute to her plan greater than the $1,170.00 listed in her schedules as her monthly income, except for income anticipated to be generated from the premises if it should be rehabilitated and rented.

34. In light of Debtor's limited personal income, the anticipated rental income to be generated from the premises should it be rehabilitated and fully occupied by tenants, is the only significant source of income anticipated and projected for payments under the Debtor's reorganization plan.

35. Debts listed in the bankruptcy and encumbering the premises total less than

$4 million. The premises comprises a "single asset real estate" as defined in 11 U.S.C. § 51(A).

36. The premises is a residential rental business, notwithstanding the current state court injunction imposed prohibiting current occupancy, and no other business is being conducted or has been conducted at the premises, except as incidental to the residential rental business. The Debtor's plan proposes to operate the premises as a residential rental property once it is rehabilitated.

37. The Debtor presented no admissible evidence as to the projected income to be generated from the premises once occupied, the time necessary to fully occupy the premises, projected vacancy rates, nor projected management costs, including payment of property taxes, mortgages and liens.

38. The testimony of the City's expert witness, William J. McMahon, was much more credible and more persuasive than the testimony of the Debtor's expert, Paul Algbokhan, on the issue of the necessary costs of rehabilitating the premises.

39. The Debtor's expert, Paul Algbokhan, had limited experience in rehabilitation projects of the same size as the premises, although he did indicate having rehabilitated one 60–unit building in Chicago.

40. The Debtor's expert presented vague and inadequate details as to what work was to be done by his firm to rehabilitate the premises and provided little detail regarding how the funds estimated by him to be necessary to rehabilitate the premises would be spent.

41. The Debtor's expert, in his testimony and written project bid, failed to include a number of repairs which the City's experts credibly testified would be required to bring the premises into compliance with the Chicago Municipal Code, including rewiring of the premises electrical system as well as testing and replacement of plumbing systems.

42. The Debtor's expert was vague as to the costs and the work necessary to repair the exterior masonry and brick defects at the premises, and his estimates as to the cost of those repairs were not persuasive.

43. The City's experts, Fuscaldo, Brennan, and Ovalle, were more persuasive in their testimony regarding the repairs which would be required to properly rehabilitate the premises, providing extensive detail as to the various defects in the premises and the work necessary to repair them, including many items not included in the estimate or bid submitted by Paul Algbokhan.

44. The City's expert, William J. McMahon, although he had no experience as a contractor in the last ten years, had extensive experience pricing similar projects, albeit for projects in which the City contributed to the costs of rehabilitation.

45. William J. McMahon based his estimates of the costs of rehabilitation on industry pricing guides, a previous project proposal for the premises, as well as a comparable rehabilitation project for a similar structure. Although he presented no testimony as to a method for confirming the accuracy of these estimates, his estimates were detailed and credible, and found to be admissible and reliable, and his methodology is one in common use to make such estimates.

46. The credible testimony of the City's expert witnesses was that cost of rehabilitation of the premises clearly exceeds $2 million.

47. The weight of the expert testimony and all evidence taken as a whole clearly indicate that the Debtor's witness, Paul Algbokhan, greatly underestimated the necessary costs of properly and adequately rehabilitating the premises to the extent required to operate lawfully under City ordinances.

48. The cost of rehabilitation of the premises necessary to bring the premises

into compliance with the Chicago Municipal Code and lift the permanent injunction imposed in state court case no. 97–M1–404185, and therefore necessary in order to occupy the premises with tenants and thereby generate the requisite income under the Debtor's reorganization plan, exceeds $2 million.

49. The Debtor's evidence only indicates the possible availability of $292,-000.00 in loans for the rehabilitation project from Pacific Phoenix, which is quite insufficient to pay the necessary costs of rehabilitation. Debtor did not establish other sources of funding to pay for the rehabilitation.

50. Therefore, there is no reasonable possibility of a successful reorganization within a reasonable amount of time under the Debtor's Chapter 13 reorganization plan filed in this case, and cause has been established by the City for modification or annulment of the automatic stay.

51. Additional fact statements contained in the Conclusions of Law will stand as additional Findings of Fact, and conclusions of law contained in the Findings of Fact will stand as additional Conclusions of Law.

## CONCLUSIONS OF LAW

### A. Jurisdiction

This Court has jurisdiction over this contested motion pursuant to 28 U.S.C. § 1334(a), (b) and 28 U.S.C. § 157(a), (b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

### B. Annulment of the Automatic Stay is Appropriate in This Case

1. This Court has authority and discretion to terminate, annul, modify, or condition the automatic stay imposed by 11 U.S.C. § 362(a), pursuant to 11 U.S.C. § 362(d).

2. Specifically, under the evidence and facts found as aforesaid, the automatic stay may be annulled or modified under 11 U.S.C. § 362(d)(3), in that the City, as creditor secured by an interest in the premises, seeks with respect to its state court proceeding to confirm the foreclosure sale of property constituting a single asset real estate, namely the Debtor's premises commonly known as 3333–37 West Washington Street in Chicago, Illinois.

3. The Debtor carries the burden of proof in a proceeding on a motion to modify the automatic stay to show that the stay should not be modified. *In re Sauk Steel Co., Inc.*, 133 B.R. 431, 436 (Bankr. N.D.Ill.1991), except as to the issue of whether Debtor has equity.

4. The premises is single asset real estate under 11 U.S.C. § 362(d)(3) and as defined by 11 U.S.C. § 101(51B).

5. The Debtor has not filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time. Nor has Debtor commenced payments to each creditor whose claims are secured by the premises, as required by 11 U.S.C. § 362(d)(3)(A) and (B).

6. Annulment of the automatic stay grants retroactive relief to the movant, allowing the creditor for whose benefit the stay is annulled to proceed as if the bankruptcy had never been filed and the automatic stay had never been imposed. *In Re Albany Partners, Ltd.*, 749 F.2d 670, 675 (11th Cir.1984); *In Re Ligon*, 97 B.R. 398, 399 (Bankr.N.D.Ill.1989).

7. Annulling the stay is a remedy which may be granted at discretion of the Bankruptcy Judge only in limited circumstances. *In Re Albany Partners, Ltd.*, 749 F.2d at 675.

8. It is appropriate to annul the automatic stay retroactively whenever a creditor did not have actual knowledge of the applicability of the automatic stay at the time the creditor violated the stay, and the creditor would be unfairly prejudiced if the debtor could raise the stay as a defense to the action or proceeding in which the creditor seeks to perfect an interest in

the premises. *In re Lipuma,* 167 B.R. 522, 526 (Bankr.N.D.Ill.1994).

9. Unfair prejudice to such a creditor arises from the debtor's ability to raise the automatic stay as a defense where the creditor had a valid legal basis for lifting the automatic stay at the time that the action or proceeding sought to be stayed occurred. *Id.* at 526.

10. In the instant case, the City proceeded to public sale of the premises after due inquiry was made, without actual notice that the § 362(a) automatic stay was applicable to the premises. In addition, it was the Debtor's own actions of obtaining a quitclaim deed to the premises on the eve of foreclosure sale, her filing in bankruptcy on the same day as the sale, and failing at the time to file schedules listing the premises as an asset of the bankruptcy estate, all of which obstructed or delayed the City's inquiry into whether or not the automatic stay was applicable to foreclosure sale of the premises.

11. Neither party raised the issues of qualifications of, the reliability of, nor the weight to be given the testimony of the City's expert witnesses who testified in this case, under standards detailed in *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). However, under standards applicable to expert testimony set forth in *Kumho Tire,* the Court finds and concludes that such testimony was credible, admissible, and reliable.

12. The cost of rehabilitation of the premises clearly exceeds $2 million, and the Debtor's evidence only indicated the availability of $292,000.00 to rehabilitate the project. Therefore, there is not and has not during the bankruptcy proceedings been a reasonable possibility of a successful reorganization within a reasonable amount of time under the Debtor's Chapter 13 reorganization plan. Hence, at the time of the January 22, 1999, foreclosure sale, the City had a valid legal basis to seek stay modification.

13. In addition to obtaining a quitclaim deed to the premises on the eve of the foreclosure sale, filing a personal bankruptcy on the same day as the sale, and failing to timely file schedules listing the premises as an asset of the bankruptcy estate, the Debtor also failed to present the City with a copy of the deed reconveying the property to the Debtor until February 25, 1999. These actions and omissions can reasonably be concluded to indicate that the filing of Debtor's Chapter 13 petition was not undertaken in good faith, but only to foil the foreclosure sale, especially considering the fact that there was never a reasonable possibility of a successful reorganization within a reasonable amount of time under the Debtor's Chapter 13 reorganization plan.

14. Such lack of good faith further supports the retroactive annulment of the automatic stay. *In re Albany Partners, Ltd.,* 749 F.2d at 675; *In re Sanders,* 198 B.R. 326, 330 (Bankr.S.D.Cal.1996), *dismissed by* (9th Cir. BAP 1997) (Table).

### CONCLUSION

Cause has therefore been shown by the City to grant its motion for annulment of the automatic stay with respect to the premises, and an Order for such relief will be separately entered.