**In re Moazma SYED, Debtor.**

**Bankruptcy No. 99 B 00245.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Aug. 16, 1999.

John E. Gierum, Park Ridge, IL, for Movant.

Assistant Anthony E. Simpkins, Corporation Counsel, Chicago, IL, for Respondent.

Thomas Vaughn, Chicago, IL, Chapter 13 Trustee.

### MEMORANDUM OPINION ON DEBTOR'S MOTION TO ALTER OR AMEND FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER ENTERED MAY 13, 1999

JACK B. SCHMETTERER, Bankruptcy Judge.

This proceeding relates to the bankruptcy case filed here by Moazma Syed ("Debt-

or" or "Syed") under Chapter 13 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* on January 6, 1999. Debtor owns property commonly known as 3333–37 West Washington Street in Chicago, Illinois (the "Premises"). Prior to the bankruptcy filing, the City of Chicago obtained a judgment foreclosing its liens on the Premises. Unaware that Debtor's pending bankruptcy involved the premises, the city scheduled and held the foreclosure sale. Upon learning that Debtor had obtained title to the premises on the eve of filing her bankruptcy, the City moved here to modify or annul the automatic stay. After an evidentiary hearing, the City's motion to annul the stay was granted and confirmation of Debtor's plan was denied. Debtor then filed her motion to alter or amend the order annulling the automatic stay. . For reasons discussed below, that motion will be denied.

## BACKGROUND

The facts concerning this motion are set out in the May 13, 1999, Memorandum Opinion and Findings of Fact and Conclusions of Law on which the order annulling the automatic stay was based. *In re Syed,* 238 B.R. 126 (Bankr.N.D.Ill.1999) (opinion available at http://www.ilnb.uscourts.gov/JudgSchmetterer/Opions/ro051-399.pdf). Only facts from those findings relevant to the instant motion will be repeated herein.

As stated, Debtor filed her Chapter 13 bankruptcy petition on January 6, 1999. Two days earlier, on January 4, 1999, the Debtor obtained title to the Premises from the New Chatfield Corporation (a corporation whose stock is wholly owned by Debtor) by quitclaim deed. That deed was recorded on January 5, 1999, with the Cook County Recorder of Deeds.

Through successive owners, the Premises was maintained in a consistent state of disrepair and was the subject of four housing court cases filed by the City in the Circuit Court of Cook County Illinois. Receiver's certificates were issued in each of the four cases, and liens arose in favor of the City by reason of those receiver's certificates. On December 2, 1997, in the Circuit Court of Cook County, Illinois, the City obtained a judgment of foreclosure on its liens and for judicial sale of the Premises in case number 94–CH–2302, in an effort to satisfy the liens then amounting to a total of $79,672.00.

On July 15, 1998, through state court orders entered in case no. 97–M1–404185, the City exercised its police powers to effect emergency evacuation of all remaining tenants and occupants of the Premises due to numerous and imminently dangerous defective conditions which then directly threatened the life and safety of residents. At the time of trial in this case, the Premises remained entirely vacant in possession of the Debtor Ms. Syed, but in a dilapidated condition and in need of extensive repair. On July 21, 1998, a judge of the Circuit Court of Cook County entered an order of permanent injunction affecting the Premises and its ownership and management that, *inter alia,* prohibited it from being leased or occupied until all Chicago Building Code violations at the site are repaired, and until further order of that court. That injunction remained in place when debtor filed in bankruptcy almost six months later.

On January 6, 1999, a public foreclosure sale of the Premises was scheduled but adjourned upon notice of the bankruptcy filing by Ms. Syed that day. Counsel for the City examined the public records of the Cook County Recorder of Deeds that day, but did not find evidence of the January 4, 1999, quitclaim deed to Debtor. The public records on that date still indicated only that Ms. Syed had transferred her interest in the Premises to Shafqat H.K. Syed sixteen months earlier on September 7, 1997.

On January 6, 1999, counsel for the City also examined the files for the Debtor's Chapter 13 case at the office of the Clerk of the Bankruptcy Court for the Northern

District of Illinois, and found no schedules listing the Premises as an asset of the bankruptcy estate. It was not until February 18, 1999, that Debtor filed a full set of schedules showing the Premises as her asset. At trial, Debtor's counsel acknowledged that no schedules were attached to Debtor's bankruptcy petition when it was filed, though neither party offered Debtor's bankruptcy petition or schedules as an exhibit.

Accordingly, counsel for the City reasonably believed on January 6, 1999, that the Debtor's bankruptcy and the automatic stay arising therefrom was inapplicable to the subject Premises, and he caused the public foreclosure sale through state court proceedings to recommenced on January 22, 1999, at which sale the City of Chicago was successful bidder.

On February 25, 1999, counsel for the City learned for the first time of the January 4, 1999, quitclaim deed by the New Chatfield Corporation, reconveying the Premises to the Debtor, and the City stopped its efforts to obtain an order confirming the foreclosure sale in the Circuit Court of Cook County. The City filed its motion here on March 11, 1999, to modify or annul the automatic stay under 11 U.S.C. § 362(d).

During the evidentiary hearing on that motion, this court found that Debtor obtained a quitclaim deed to the Premises from her own corporation on the eve of the foreclosure sale, and recorded it the same day before filing her personal bankruptcy, but took six weeks to schedule the subject Premises as the only asset of her bankruptcy estate. Debtor's actions were inferred to have been a last ditch effort to foil public sale of the Premises scheduled for January 6, 1999, pursuant to the state court judgment of foreclosure. Moreover, it was found that Debtor's act of obtaining a quitclaim deed to the Premises on the eve of the foreclosure sale, and her delay in filing schedules listing the Premises as an asset of the bankruptcy estate until February 18, 1999, obstructed or delayed the City's inquiry into whether or not the bankruptcy automatic stay was applicable to sale of the Premises.

It was further found from the earlier hearing that the City's act of conducting a post-bankruptcy foreclosure sale of the Premises January 22, 1999, was an innocent violation of the automatic stay imposed by 11 U.S.C. § 362(a), undertaken without knowledge that the automatic stay applied to prohibit sale of the Premises, and after adequate and reasonable inquiry by its lawyers into whether or not the stay did apply to the Premises. It was also found that costs of required construction were far in excess of loans available to debtor to fund the work and therefore Debtor had no chance of a successful reorganization based on operating the Premises. Accordingly, Plan confirmation was denied. Based upon the City's innocent violation and Debtor's bad faith in filing a hopeless Chapter 13 bankruptcy simply to block the foreclosure sale, the stay was annulled and thus the state court sale was validated.

## JURISDICTION

This matter is properly before the Court pursuant to 28 U.S.C. § 157, Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois, 28 U.S.C. § 1334, and 28 U.S.C. § 1409. This matter constitutes a core proceeding under 28 U.S.C. § 157(A), (G), and (L).

## DISCUSSION

 This motion to alter or amend judgment has been brought under Fed. R.Civ.P. 59, which is incorporated by Fed. R.Bankr.P. 9023. Motions under Rule 59 can only be brought to deal with manifest errors of law or fact, or if there is a need to present newly discovered evidence. *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986). Rule 59(e), however is not a "vehicle for a party to undo its own procedural failures, and it

certainly does not allow a party to introduce new evidence or advance arguments that could or should have been presented to the district court prior to the judgment." *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 729 (7th Cir.1999) (citing *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir.1996)).[1] The decision to grant or deny a Rule 59 motion is within the Court's discretion. *LB Credit Corp. v. Resolution Trust Corp.*, 49 F.3d 1263 (7th Cir.1995).

### The Premises are a "Single Asset Real Estate"

■ Debtor makes several arguments as to why judgment should be amended. First, she argues that the court erroneously concluded in the earlier ruling that the Premises fell within the Code definition of single-asset real estate. Section 362(d) "requires the court, on request of a party in interest, to grant relief from the stay, such as by terminating, annulling, modifying, or conditioning the stay, for cause." H.R.Rep. No. 595, 95th Cong., 1st Sess. 343 (1977), U.S.Code Cong. & Admin.News (1978) 5963, 6300. The section also includes specific language with respect to a stay against single asset real estate as well as the "for cause" basis:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-

(1) *for cause*, including the lack of adequate protection of an interest in property of such party in interest;

\* \* \*

(3) *with respect to a stay of an act against single asset real estate under* subsection (a), by a creditor whose claim is secured by an interest in such real

estate, *unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90–day period)*—

(A) *the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or*

(B) the debtor has commenced monthly payments to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien), which payments are in an amount equal to interest at a current fair market rate on the value of the creditor's interest in the real estate.

11 U.S.C. § 362(d)(1) and (3) (emphasis added). The purpose of the latter section is to impose an expedited time frame for filing a confirmable plan in cases involving "single asset real estate." *In re Kkemko, Inc.*, 181 B.R. 47, 49 (Bankr.S.D.Ohio 1995). Single asset real estate is defined as:

real property constituting a single property or project, other than residential real property with fewer than 4 residential units, *which generates substantially all of the gross income of a debtor* and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto having aggregate noncontingent, liquidated secured debts in an amount no more than $4,000,000;

11 U.S.C. § 101(51B) (emphasis added). It is beyond doubt that the Premises consists of a single residential real property having far more than 4 residential units. The only business ever attempted or contemplated by Debtor for the future was in

---

**1.** Debtor attempted to submit additional evidence in the form of affidavits in conjunction with her motion to reconsider. A motion to reconsider is not the appropriate forum to offer new evidence which was previously available to the parties. Therefore, her affidavits were stricken. The City, in response to Debtor's affidavits had offered affidavits of its own but withdrew those once Debtor's affidavits were stricken.

operation of the Premises as residential real estate. Moreover, the Debtor does not claim that her aggregate noncontingent, liquidated secured debts total more than $4,000,000.

■ Debtor's only argument contends that the phrase "generates substantially all of the gross income of a debtor" in section 101(51B) is limited solely to present income (since the Premises currently generates no income) and does not include future income (even though Debtor seeks rehabilitation of the property so that it will then generate substantially all of her income and substantially all income used to fund the plan). It seems clear, however, from the relevant case law, that "single asset real estate" includes property formerly used and intended to be used in the future as income producing property.

■ The phrase "single-asset real estate" was intended in the statute to encompass an apartment building, office building, or strip-mall shopping center "owned by an entity whose sole purpose was to operate that real estate with monies generated by the real estate." *In re Philmont Development Company*, 181 B.R. 220, 224 (Bankr.E.D.Pa.1995). Moreover, the definition of "single-asset real estate" has been found to include partially developed land generating no income as well as raw land. *See In re Oceanside Mission Assoc.*, 192 B.R. 232, 236 (Bankr.S.D.Ca.1996) (citing *In re Humble Place Joint Venture*, 936 F.2d 814 (5th Cir.1991)); *Kkemko*, 181 B.R. at 51.

> [T]he fact that the real property is currently undeveloped and not generating any income for the Debtor is of little consequence for purposes of the inquiry here, since the Court is satisfied that Congress did not intend to excuse from compliance with the revised statute the class of debtors who hold undeveloped tracts of land for future development.

*In re Pensignorkay, Inc.*, 204 B.R. 676, 682 (Bankr.E.D.Pa.1997).

Debtor did not to cite to authority holding that the phrase "generates substantially all of the gross income of a debtor" is limited solely to present income. Rather, Debtor cites to *In re Jacksonville Riverfront Development, Ltd.*, 215 B.R. 239, 244 (Bankr.M.D.Fla.1997) for the proposition that Congress did not intend to deny single asset real estate debtor any right to reorganize in any case. This is certainly correct, but not pertinent here. Moreover, the court's decision in *Jacksonville Riverfront* was not based upon 11 U.S.C. § 362(d)(3) as the *Jacksonville* court found that the case was not a single asset case. *Id.* at 244, n. 5.

The stay was not annulled here merely because Debtor filed a single asset real estate case. Rather, it was annulled primarily because it was found that Debtor had not (as required by section 362(d)(3)) filed a plan of reorganization with a reasonable possibility of being confirmed within a reasonable time. Conclusions of Law ("Conclusions") ¶ 5. The stay was also annulled because it was found that Debtor transferred title to her property literally on the eve of her bankruptcy filing and had filed her bankruptcy in bad faith, Conclusions ¶ 13, thus providing "cause" under 11 U.S.C. § 362(d)(1).

### Bad Faith

The court found that Debtor's filing was in bad faith based upon Debtor's obtaining a quitclaim deed to the Premises on the eve of the foreclosure sale, filing bankruptcy the day of the sale, failing to file timely schedules listing the Premises as an asset of the estate, and failing to present the City with a copy of the deed reconveying the property to the Debtor when the state court sale had been scheduled. The court also found that the bankruptcy was not undertaken in good faith, but only to foil the foreclosure sale especially considering the fact that there was never a reasonable possibility of a successful reorganization within a reasonable amount of time. Conclusions ¶ 13.

Debtor argues that she believed her bankruptcy was feasible, and therefore she did not file in bad faith. Debtor's Chapter 13 plan, filed February 18, 1999, proposed to pay back $335,000 in tax claims by the Internal Revenue Service at a monthly rate of $1,170 until September 1, 1999, when Debtor's monthly plan payments would increase to $10,000. Debtor's plan was estimated at 30 months. Debtor's plan failed to take into account any interest that might accrue on the City's lien or the unpaid real estate taxes. April 19, 1999, Tr. at 101–02. But her main problem was that Debtor's plan could only be successful if there were a full renovation of the Premises and a mortgage loan to finance the renovation. She did not show that there is any possibility of that happening. "Bad faith" is not the same as ill will or bad intent, but may be objectively inferred from the impossibility of confirming a proposed plan. That is exactly the basis for the bad faith finding here.

### Rehabilitation Cost

Debtor argues her plan was feasible because her loan prospects would have covered the costs of her rehabilitation estimate; she contends that her plan was feasible because her construction estimate was more accurate than that of the City's experts.

Debtor argues that she had $292,000 in loans available. The parties stipulated that if Joan deSouza, CEO of Pacific Phoenix Group ("the bank"), were to testify, she would state that the bank was willing to offer up to $292,000 secured by mortgages on other properties which are not owned by Debtor. April 23, 1999, Tr. at 16, 19. Counsel for the City was not willing to stipulate that the money would be available for the rehabilitation of the Premises, only that the funds might be available. *Id.* at 20. While there was no guarantee that the funds loaned on these nondebtor properties would be at Debtor's disposal, the Court assumed the likelihood of such availability.

Debtor's estimate as to cost of rehabilitation of the Premises was severely lacking in accuracy and credibility. The City's witnesses, all of whom were qualified as experts, gave persuasive and credible testimony that the property requires a complete gutting and renovation at a cost over $2.5 million. Debtor's witnesses, only one of whom was qualified as an expert, gave testimony that was less than credible concerning the construction cost required for the Premises to meet city code requirements. Paul Algbokhan, Debtor's expert, testified that the property could be brought up to code at a cost of only $221,000. Although Mr. Algbokhan is an experienced contractor, he has only rehabilitated one other building of a size comparable to the Premises. April 19, 1999, Tr. at 39. Mr. Algbokhan is neither a licensed carpenter, plumber, or electrician. Rather, Mr. Algbokhan testified he has employees who are licensed carpenters, plumbers, and electricians. However, Mr. Algbokhan did not consult with a structural engineer to determine whether the Premises had any structural problems.

### The Newly Raised Kumho Issue

The experts offered by the City had substantially more experience and were substantially more credible as expert witnesses. Debtor's attorney did not object to the City's plumbing expert Jonathan Brennan or the City's electrical expert Jose Ovalle. William J. McMahon and Frank Fuscaldo were qualified as experts over Debtor's objection. Although Debtor raised no *Kumho* objection during trial, the court expressly found that all four of the City's witnesses qualified as experts under the Supreme Court's decision in *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Debtor now, for the first time after trial, argues that qualifying Mr. McMahon and Mr. Fuscaldo as experts without questioning those witnesses as to their application of claimed expertise, standards, and procedures based on the partic-

ular facts of this case is required by *Kumho* and failure to do so constitutes an abuse of discretion.

■ First, it is clear that Debtor's trial counsel could have asked any question touching on expertise and could have raised the *Kumho* issues. Failure to do so waived the issue. *International Surplus Lines Ins. Co. v. Fireman's Fund Ins. Co.,* 998 F.2d 504, 507, n. 2 (7th Cir.1993).

■ Moreover, on the merits, the belated arguments are not valid. In *Kumho,* the Supreme Court settled the debate as to whether the "gatekeeping" obligation set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) applies to all expert witnesses or just scientific experts. The opinion, authored by Justice Breyer, clearly states that the *Daubert* factors apply to all expert testimony but also gives a court considerable leeway in determining whether a *Daubert* hearing is necessary. *Kumho,* 119 S.Ct. at 1173–74, 1175–77. All expert testimony must be both relevant and reliable. *Daubert,* 509 U.S. at 589, 113 S.Ct. at 2795. There are four factors for determining whether a theory or technique constitutes expert knowledge that will assist a trier of fact: (1) Can the theory be or has it been tested; (2) has the theory or technique been subjected to peer review and publication; (3) what is the known or potential rate of error; and (4) whether the theory or technique is generally accepted in the relevant scientific or other expert community. *Id.* at 593–94, 113 S.Ct. at 2796–97. Not only is this inquiry a flexible one, *Id.* at 594, 113 S.Ct. at 2797, but the list of factors is nonexclusive. Judge Richard Suhrheinrich, *The Sixth Circuit Year in Review—Leading Cases of 1994,* 25 U.Mem.L.Rev. 365, 443 (1995).

■ After *Kumho,* it is indeed clear that *Daubert* applies to all expert witness testimony not just to scientific testimony. However, *Kumho* does not require a court to hold a full *Daubert* hearing each time a

party offers expert witness testimony. The *Kumho* opinion stated that:

> a trial court may consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert,* the test of reliability is "flexible," and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, *the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.*

*Id.* (emphasis added). The use of the word "may" indicates the permissive nature of the ruling. The Daubert factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.,* 119 S.Ct. at 1175. As a result, the four factors might not apply in part or even as a whole. The Court explained why the *Daubert* factors might not apply in a particular case:

> It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist. Nor, on the other hand, does the presence of *Daubert's* general acceptance factor help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy.

*Id.,* 119 S.Ct. at 1175. The Opinion expressly stated that a full *Daubert* hearing is unnecessary where "the reliability of an expert's methods is properly taken for granted." *Id.,* 119 S.Ct. at 1176.

· In no way was it necessary for the court to hold a full *Daubert* hearing to qualify

either the City's experts or Debtor's expert, nor did Debtor's counsel request such a hearing at trial.

■ Nevertheless, the City's experts met the *Daubert* and *Kumho* tests. Mr. McMahon had extensive experience pricing similar projects and based his estimates of the costs of rehabilitation on industry pricing guides, a previous project proposal for the Premises, as well as a comparable rehabilitation project for a similar structure. His estimates were detailed, credible, admissible, and reliable. Most significantly, his methodology was one commonly used to make such estimates. Mr. Fuscaldo, a building inspector for the city, had extensive experience in carpentry and masonry and was qualified as an expert to provide testimony on the condition of the Premises and as to what repairs would be necessary to bring the property up to code. His methodology is use his own observation and experience as well as the City of Chicago building code book. Thus, both Mr. Fuscaldo and Mr. McMahon were properly qualified as experts.

The City's estimate of $2.5 million as the cost of needed construction was far more credible than that of Debtor's expert. In general, a number of the items necessary to bring the building up to code were omitted from Mr. Algbokhan's estimate or were not adequately covered in his estimate. For example, he testified that *five-eighths* inch drywall would be used throughout hallways (April 19, 1999, Tr. at 51); the City's expert, Frank Fuscaldo testified that the fire rating Code actually required *five-eighths-x* inch drywall. (April 19, 1999, Tr. at 136). Five-eighths-x inch drywall is substantially different from five-eighths inch drywall. Moreover, Mr. Algbokhan's estimate did not include exterior brick, masonry work, or elevator repair. (April 19, 1999, Tr. at 56). Rather, a separate estimate of his for $10,000 covered tuckpointing work. (April 19, 1999, at 59). However, as the Premises is actually concrete with a brick facade, any damage to the concrete structure beneath the brick would require an additional expense. (April 19, 1999, at 59–60). Mr. Fuscaldo testified that large sections of masonry need repair and that the building now presents a hazard of falling bricks. (April 19, 1999, at 141). Mr. Fuscaldo also testified that there are structural problems requiring the services of a structural engineer. (April 19, 1999, at 143–44). The City's expert William McMahon testified that necessary repairs to the exterior of the building would be very expensive. (April 19, 1999, at 198).

Debtor's estimate also fails to include repairing the firewalls or fixing or installing a sprinkler or fire alarm system for the property. Such work is necessary. Mr. Fuscaldo testified that the firewalls were breached in almost every apartment. (April 19, 1999, at 139–40). Likewise the estimate by Debtor's expert omitted any repairs to the fire escape (April 19, 1999, at 66) which Mr. Fuscaldo testified would be required. (April 19, 1999, at 144). Moreover, that estimate did not include rewiring of the building, only changing the receptacles, switches, and electrical fixtures. (April 19, 1999, at 67). However, Jose Ovalle, the City's expert, testified that the Premises requires a complete rewiring to meet the city Code. (April 19, 1999, at 165). Removal and replacement of the existing wiring would involve a substantial additional cost. (April 19, 1999, at 69). Substantial plumbing work that was not covered by Mr. Algbokhan's estimate would also be required. (April 19, 1999, at 152, 156–57).

Based upon the foregoing record and the fact that the City's experts were more credible and more persuasive than Debtor's expert or other witnesses, the court found that the cost of rehabilitation of the Premises would clearly exceed $2 million, far more than loans shown available to Debtor for construction.

### Income Projection

■ Finally, Debtor's evidence of projected income from the Premises if it

were rehabilitated was not persuasive. Zia Gilani testified on Debtor's behalf as to projected income from the property. Mr. Gilani was not qualified as an expert on real estate investment or real estate management. Exhibit number 5, which was Mr. Gilani's rent forecast and monthly budget and projected income, was not admitted. Substantially all of Mr. Gilani's testimony was with regard to the figures in the exhibit and was found to have no basis other than on his opinion. It was simply not credible, nor was it admissible under Federal Rule of Evidence 701 which states that a lay witness giving opinion testimony may only give opinion testimony which is rationally based on the perception of the witness and helpful to a clear understanding of the witness' testimony or a determination of a fact in issue. Fed. R.Evid. 701. "The difference between an expert witness and an ordinary witness is that the former is allowed to offer an opinion, while the latter is confined to testifying from personal knowledge." *United States v. Williams*, 81 F.3d 1434, 1442 (7th Cir.1996). Thus, a real estate finance expert would be able to testify as to projected rentals for a particular property. A lay witness, however, is limited to testimony based upon personal knowledge, such as the owner of a house who testifies regarding value based upon the purchase price. *Malloy v. Monahan*, 73 F.3d 1012, 1016 (10th Cir.1996). Mr. Gilani testified, not based upon personal knowledge, but based upon a variety of different sources. April 19, 1999, Tr. at 96–105.

In addition, Debtor testified that the monthly income when the Premises was occupied was $17,000. April 19, 1999, Tr. at 120. However, Debtor's own statement of financial affairs belies this testimony. In 1997, the Premises only produced $132,-000 in gross annual income, which was an average of $11,000 monthly. In 1998, when the building was only occupied for half the year, the Premises earned only $66,000, also $11,000 monthly. Debtor's testimony as to income was simply not credible or supported and her belief as to

plan feasibility if the Premises were rehabilitated did not have a solid basis.

*Stay Annulment*

■ Debtor argues that even if the stay were properly modified, annulment of the stay was inappropriate. The bankruptcy court has wide latitude to grant relief from the automatic stay including the ability to retroactively annul the stay. *In re National Environmental Waste Corp.*, 129 F.3d 1052, 1054 (9th Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 2368, 141 L.Ed.2d 736 (1998).

> Annulment is unique because it asks the court to approve post-petition action which violated the automatic stay. Courts have been hesitant to annul the stay because of the nature of the relief, specifically that it works in a retroactive manner. Such relief can only be granted in accordance with equitable principles. Annulment can only be granted if the creditor did not have knowledge of the applicability of the automatic stay and to allow the automatic stay to apply would unfairly prejudice the creditor.

*In re Szyszko*, 234 B.R. 408, 412 (Bankr. N.D.Ill.1999) (internal citation omitted). As earlier discussed, it is clear that the City's counsel did not have knowledge of the applicability of the automatic stay. Moreover, to require the City to reschedule the foreclosure sale would result in unfair prejudice to the City. Debtor filed a bad faith Chapter 13 petition solely to foil the foreclosure sale. There is no reason to doubt that when confronted with similar circumstances on the eve of a rescheduled foreclosure sale, Debtor would again transfer the property and file another bad faith petition.

First, Debtor argues that she was severely prejudiced by her reliance on the automatic stay. She states that she did not appear at the sale to bid or request someone else to appear on her behalf based upon her reliance that the automatic stay would prevent the sale from proceed-

ing. Motion to Alter at ¶ 7.[2] Debtor did not show by evidence her financial ability to bid on the Premises at the sale. Moreover, she presented no evidence at trial that she or anyone representing her would have been able to appear at the sale and bid on her behalf.

Debtor also argues that annulment was inappropriate in that the City knew Debtor had filed a bankruptcy but still proceeded with the rescheduled foreclosure sale. While the City was aware that Debtor had filed bankruptcy, it was unaware until February 25, 1999, that Debtor was the owner of record of the subject property and that the automatic stay applied to the Premises. Findings of Fact ("Findings") ¶¶ 20, 21.

As stated, Debtor quitclaimed the Premises to herself from the New Chatfield Corporation on the eve of the foreclosure sale and her bankruptcy filing. Upon learning that Debtor had filed a bankruptcy petition, Counsel for the City postponed the public sale of the Premises and examined the records at the Cook County Recorder of Deeds. However, the property records had not yet been updated and the records still indicated that Shafqat H.K. Syed was the owner of record. Counsel for the City than examined Debtor's bankruptcy file and found no schedules listing the Premises as an asset of the bankruptcy. Finding ¶ 18. Debtor argues that the court's finding that no schedules were filed with the bankruptcy petition was erroneous in that Schedule D, a listing of Creditors Holding Secured Claims, was attached to the petition and listed City of Chicago among the secured creditors.

However, Finding ¶ 18 was based on the evidence presented at trial. Neither party offered the bankruptcy petition or its attachments as an exhibit, but Debtor's own counsel acknowledged at trial that no schedules listing the Premises were filed with the bankruptcy petition. Thus, the

court's finding was based upon evidence given at trial and that stipulation by Debtor's counsel. If parties wish to refer the court to documents that are part of the bankruptcy record without presenting the actual documents during the hearing, they should ask the bench to take judicial notice of the documents and offer them into evidence. Debtor cannot now, in a post-trial motion, offer contradictory evidence available at trial but not used. Moreover, Schedule D showing the City as a secured creditor (but not specifying the Premises as part of the bankruptcy estate) was the only schedule filed with the petition. Schedule A, listing Debtor's Real Property, which listed the Premises as Debtor's sole real property asset, was not filed until February 18, 1999. Thus, any confusion on the City's part was caused by Debtor's efforts to delay the foreclosure and the unexplained six week delay in filing Schedule A

It is true that had the City contacted Debtor's attorney upon receiving notice of Debtor's filing, the City might have been informed that Debtor had transferred the Premises back to herself on the eve of foreclosure and bankruptcy thus subjecting the Premises to the automatic stay. However, the City's attorneys were reasonable to rely on the bankruptcy records, and also on the public recorded property records which are the best evidence showing status of land titles. The City made a good faith effort to determine whether Debtor's bankruptcy in any way affected the sale of the property. It was only because of Debtor's actions and omissions that the foreclosure sale went forward in violation of the automatic stay and in ignorance of applicability of the stay to the Premises. Consequently, and for reasons earlier stated, stay annulment was warranted.

### CONCLUSION

Debtor has not shown any errors of fact or law, and has offered no new evidence

---

**2.** It must be noted that in the stricken affidavits submitted by Debtor and her trial counsel both state that they appeared at the January

6, 1999 sale. Although the affidavits were stricken, it does put the accuracy of this statement into question.

unavailable to her at trial. Thus, for reasons stated above and by order to be entered Debtor's motion to alter or amend the Order Annulling Automatic Stay is denied.