**LB CREDIT CORPORATION, Plaintiff–Appellant,**

v.

**RESOLUTION TRUST CORPORATION, as Receiver for Concordia Federal Bank for Savings, Defendant–Appellee.**

No. 94–1610.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 26, 1994.

Decided March 10, 1995.

Michael L. Weissman, McBride, Baker & Coles, John D. Lien (argued), Joan M. Kubalanza, Foley & Lardner, Chicago, IL, for plaintiff-appellant.

Thomas R. Meites, Michael M. Mulder (argued), Paul W. Mollica, Roberta Levinson, Meites, Frackman, Mulder & Burger, Chicago, IL, Richard T. Aboussie, Resolution Trust Corp., Office of the Gen. Counsel, Washington, DC, for defendant-appellee.

Before GOODWIN,* COFFEY and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

After its appointment as the receiver for the insolvent Concordia Federal Bank for Savings, the Resolution Trust Corporation exercised its authority under the Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. § 1821(e), to repudiate a lease that had been partially assigned to LB Credit Corporation. LB Credit sued the RTC for damages, contending that the retroactive application of FIRREA to a lease that pre-dated the statute amounted to an unconstitutional taking of private property. The district court held for the RTC, reasoning in part that the repudiation of the lease merely deprived LB Credit of future rent payments and consequently there was no improper taking. LB Credit appeals, contending that because a substantial portion of the remaining payments under the lease represents the recovery of its capital investment rather than profit, the district court's rationale was in error. Because LB Credit failed to raise its capital recovery theory in a timely manner before the district court, we find the argument waived and affirm the judgment.

## I.

In 1987, Concordia leased data processing equipment from Unisys Financial Corporation. The terms of the lease called for Concordia to make total payments of more than $900,000 over the next six years. In 1988, Unisys assigned a portion of its interest in the lease to Wells Fargo Leasing Corporation, along with certain securities that Concordia had pledged in order to secure its obligations under the lease. (Unisys retained the remainder of its interest in the lease, as well as some of the pledged securities.) Wells Fargo eventually changed its name to LB Credit.

Concordia later ran into financial difficulty, and in 1990 the Office of Thrift Supervision closed the bank, declared it insolvent, and appointed the RTC as the receiver. As noted, the RTC elected to repudiate and disaffirm the lease, as was its prerogative under FIRREA.[1] No payments were overdue

---

* The Honorable Alfred T. Goodwin, of the Ninth Circuit, sitting by designation.

1. In relevant part, FIRREA provides:

In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—
   (A) to which such institution is a party;

(B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
(C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.
12 U.S.C. § 1821(e).

when the RTC repudiated the lease, but the future payments that Concordia would have been obligated to make had the lease not been disavowed totalled $546,084.63.

LB Credit subsequently repossessed the leased equipment and sold it, realizing proceeds of $40,500. With an eye to enforcing its interest in the securities Concordia had pledged as collateral, LB Credit also filed a proof of claim with the RTC for the balance of the future payments under the lease. The RTC disallowed the claim, however, and barred release of the securities to LB Credit.

LB Credit then repaired to federal court, seeking damages for the repudiation of the lease and for dishonoring its security interest in the pledged securities as well as a declaration that it could enforce its security interest. Earlier, Unisys had filed a similar suit based on the lease interest it had retained. Its suit was assigned to Judge Grady; LB Credit's action was assigned to Judge Lindberg. On the RTC's motion, Judge Grady dismissed the *Unisys* suit, concluding that the RTC was empowered under the statute to repudiate the lease and to deny Unisys access to the pledged collateral. *First Nat. Bank of Chicago v. Unisys Finance Corp.*, 779 F.Supp. 85 (N.D.Ill.1991), *aff'd*, 979 F.2d 609 (7th Cir.1992). Based to a substantial extent on Judge Grady's opinion, the RTC then moved for summary judgment in this case. After briefing was underway, LB Credit sought and received permission to amend its complaint to allege Fifth Amendment claims of an unconstitutional taking and due process violation, which had not been pursued in the *Unisys* suit.

Judge Lindberg subsequently granted summary judgment in favor of the RTC. *L.B. Credit Corp. v. RTC*, 796 F.Supp. 358 (N.D.Ill.1992). He noted that FIRREA not only granted the RTC as receiver the authority to repudiate the lease, but expressly limited the RTC's liability to any lease payments that were overdue at the time the lease was repudiated—none in this case. *Id.* at 360. Following Judge Grady's lead in *Unisys*, Judge Lindberg went on to conclude that a lessee's right to enforce its interest in the securities pledged as collateral was likewise limited to cases in which the lessor was in default when the lease was repudiated. *Id.* at 360–61. Because Concordia was current on its lease payments, he reasoned, LB Credit had no right to enforce its security interest in the securities Concordia had pledged. *Id.* at 361. This left LB Credit with the argument that the retroactive application of FIRREA (enacted two years after Concordia signed the lease) denied it due process and deprived it of property without just compensation. Judge Lindberg found this argument unpersuasive:

> [T]he RTC was not in debt to LB Credit. No rent was in arrearage when the RTC repudiated the lease. Had any back rent been owed to LB Credit prior to the lease's repudiation, plaintiff would have had a claim under FIRREA, which could have been satisfied from the pledged securities. The RTC has not interfered with LB Credit's interest in the pledged securities. It is the claim which defines the extent of the security interest; because LB Credit has no claim, LB Credit has no interest. When the RTC repudiated the lease, LB Credit lost its right to future payments under the lease. LB Credit has presented no authority that the loss of future profits constitutes an unconstitutional taking. The Supreme Court has held that the disruption of private expectations does not constitute a taking. *Penn Centr. Transp. Co. v. New York City*, 438 U.S. 104, 131, 98 S.Ct. 2646, 2663, 57 L.Ed.2d 631 (1978); *Omnia Commercial Co. v. United States*, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923) (no compensation for consequential damages); *Foster v. United States*, 2 Cl.Ct. 426, 445 n. 7 (1983) (the general rule is that there is no compensation for frustrated contracts or the loss of future income). The RTC's repudiation of the lease pursuant to section 2[11] (e)(1) of FIRREA does not constitute a taking of private property for public use without just compensation or due process in violation of the Fifth Amendment.

796 F.Supp. at 362.

Shortly after Judge Lindberg granted summary judgment in favor of the RTC, we

affirmed Judge Grady's holding in the *Unisys* case. *Unisys Finance Corp. v. RTC,* 979 F.2d 609 (7th Cir.1992). There we agreed that because repudiation of a lease pursuant to section 1821(e)(4) reduced the lessee's claim to zero (assuming no payments were past due), Unisys had no entitlement to enforce its interest in the securities that Concordia had pledged to secure its obligations under that lease. *Id.* at 611. Thus, although a security interest or lien does constitute property, no impermissible taking had occurred when Unisys was barred from enforcing that interest:

> [A] lien is property in a different sense from that in which we speak of a house as property. Subject to renovation, repair, extension, rebuilding, fire, flood, and the like, a house has a more or less constant size and shape through time. A lien is parasitic on a claim. If the claim disappears—poof! the lien is gone.... Had Concordia paid off its obligations under the lease in full, Unisys would have ceased to have a legally protected interest in the pledged securities. "There is no unconstitutional taking of a security interest that is far in excess of the claim secured by it, if, after the taking, the creditor remains adequately protected." *In re James Wilson Associates, supra,* 965 F.2d [160] at 171 [(7th Cir.1992)]. If the claim is zero, there is no taking, period. Cf. *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 601, 55 S.Ct. 854, 868–69, 79 L.Ed. 1593 (1935).

979 F.2d at 612. Noting that it had not been argued, however, we declined to consider whether the application of FIRREA's repudiation provision to a lease entered into before the effective date of the statute might constitute an unconstitutional interference with Unisys' contractual rights. *Id.*

As LB Credit acknowledges, our opinion in *Unisys* disposed of all theories except its argument that the retroactive application of FIRREA was contrary to the due process and taking provisions of the Fifth Amendment. Opening Br. at 4. Judge Lindberg, of course, had already rejected this argument in his summary judgment ruling, but after he did so, LB Credit attempted a refinement of its theory that it presented in a motion to alter or amend the judgment under Fed. R.Civ.P. 59(e). Seizing on Judge Lindberg's observation that it had "presented no authority that *the loss of future profits* constitutes an unconstitutional taking," 796 F.Supp. at 362 (emphasis supplied), LB Credit now asserted that the future payments due under the repudiated lease were not entirely profit, as it believed Judge Lindberg had assumed, but in fact largely represented the recovery of its capital investment in the leased equipment. R. 52. With the future payments so characterized, it was clear, in LB Credit's view, that the inability to recoup these payments amounted to an improper deprivation of property.

The RTC opposed the Rule 59(e) motion, contending in the first instance that LB Credit was attempting to pursue a new theory that should be deemed waived for failure to raise it earlier in the litigation. In any event, the RTC argued alternatively, the theory was doomed on its merits. FIRREA itself draws no distinctions between profits and capital recovery, the RTC pointed out, and thus bars a claim for future rents no matter how such payments are characterized. Moreover, the Fifth Amendment is not implicated, because LB Credit was not literally deprived of its property—once the lease was terminated, the equipment was returned. To the extent repudiation of the lease interfered with LB Credit's investment expectations, the disruption did not rise to an unconstitutional taking, the RTC argued. The thrift industry had long been subject to extensive regulation, and the authority FIRREA bestowed on the RTC was neither a departure from prior practice nor so intrusive on LB Credit's property interests as to require government compensation upon termination of the lease. R. 56.

The district court denied the motion. *LB Credit Corp. v. RTC,* No. 91 C 4379, 1994 WL 48596 (N.D.Ill. Feb. 16, 1994). It noted that LB Credit had never before relied on its alleged capital investment in the leased equipment, and that the sole basis proffered for the company's new focus was the court's one-time use of the term "future profits" to describe what were otherwise referred to

simply as "future rent payments" or "future payments under the lease." LB Credit had established no manifest error of law or fact, the court proceeded, because the label placed on future payments made no difference to the analysis under FIRREA or under the Fifth Amendment. Regardless of what the future payments represented to LB Credit, the company had no claim against Concordia at the time of repudiation and thus had no entitlement to the pledged securities.

From the order denying its motion to alter or amend the judgment, LB Credit appeals.

## II.

■ As we have noted previously, a motion to alter or amend a judgment is not appropriately used to advance arguments or theories that could and should have been made before the district court rendered a judgment (*Anderson v. Flexel, Inc.*, 47 F.3d 243, 247–48 (7th Cir.1995) (collecting cases)), or to present evidence that was available earlier (*King v. Cooke*, 26 F.3d 720, 726 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1373, 131 L.Ed.2d 228 (1995); *Keene Corp. v. International Fidelity Ins. Co.*, 561 F.Supp. 656, 665–66 (N.D.Ill.1982), *aff'd and adopted in relevant part*, 736 F.2d 388, 393 (7th Cir.1984)). Instead, a Rule 59(e) motion "must clearly establish either a manifest error of law or fact or must present newly discovered evidence." *FDIC v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986). The decision to grant or deny relief on such a motion is one we entrust to the district court's sound judgment. Our review here is commensurately deferential; only if the district court abused its discretion in denying LB Credit's request will we reverse. *Souter v. International Union, United Auto., Aerospace & Agric. Implement Workers of America, Local 72*, 993 F.2d 595, 599 (7th Cir.1993).

What is immediately apparent to us from the record is that LB Credit did not articulate its capital investment theory until after the court had already granted summary judgment. The first amended complaint that LB Credit was permitted to file in order to assert the Fifth Amendment claim did not suggest that any portion of the future lease payments constituted the recovery of the company's capital investment in the lease. Instead, the amended complaint alluded to Concordia's "unpaid," "remaining," and "outstanding" obligations under the lease, without any attempt to single out capital investment as a distinct component of those obligations. R. 33 ¶¶ 12, 13, 22, 33, 37. Likewise, when asked via interrogatory to state the basis for calculation of its damages, LB Credit referred generally to the "contract balance" of payments due without any mention of its lost capital. R. 56, Ex. A at 2–3. LB Credit's supplemental response to the RTC's motion for summary judgment and its "supplemental statement of material facts which require the denial of summary judgment" (each of which was filed after the amended complaint) were equally silent as to the makeup of future lease payments. R. 36 at 8–11; R. 37 at 5–6. Thus, the record before the district court on the summary judgment motion contained no hint of LB Credit's lost capital theory.

Equally apparent to us is that the singular reference to "future profits" in Judge Lindberg's opinion did not open the door to a theory which LB Credit had otherwise waived. Just as nothing in the plaintiff's briefing had suggested to the district court that the characterization of the future lease payments mattered, nothing in the court's passing remark about profits signaled a divergent understanding about the nature of these payments. Much like the parties, the district court in all other instances referred to the payments as "future rent payments" or "future payments under the lease." 796 F.Supp. at 361, 362. In that context, the reference to "profits" arguably was no more than a shorthand proxy for the former terms.

But to the extent the court's word choice reflected its underlying assumption that future payments did, in fact, represent profit to LB Credit, this was hardly a supposition that should have taken the plaintiff by surprise. The court, it turns out, was not the first to invoke the term. Note the following passage from the reply memorandum that the RTC filed in support of its motion for summary judgment:

All LB Credit has lost is the right to hold the Receiver to perform a burden-

some lease for several more years and to reap its anticipated profits. LB Credit has presented no authority that the loss of future profits constitutes a constitutional taking. On the contrary, the Supreme Court has repeatedly held that the disruption of private expectations or diminution in value does not constitute a taking. R. 41 at 11. If it was, as LB Credit now suggests, a serious misnomer to deem future payments under the lease profit, one would think that the plaintiff would have attempted to set the record straight *before* the court ruled on the summary judgment motion.

In any case, it does not seem to us that the lost capital theory would either stand or fall depending on what terminology the court chose to use in describing the future lease payments. After all, section 1821(e), as the RTC has pointed out, draws no distinctions between profit and capital recovery; on its face, the statute broadly proscribes all damages resulting from the repudiation or disaffirmance of a lease—future lease payments are future lease payments, period. *See Unisys*, 979 F.2d at 610. And we do not understand LB Credit to be arguing that *all* such lease payments are constitutionally protected. On the contrary, it concedes at the outset that "the RTC *may* deprive LB Credit of the profit element in the remaining lease payments"; it is only the "net unrecovered capital investment" which the plaintiff insists cannot be interfered with. Opening Br. at 3 (emphasis supplied).

Had this been LB Credit's theory when the summary judgment motion was being briefed, it is inconceivable to us that the company would not have been explicit about what, from its vantage point, the future payments represented. By its own admission, at least a portion of these payments indeed *did* constitute profit, and it was by no means surprising that both the RTC and the court would assume so. The extent to which the payments were not *solely* profit was a matter within LB Credit's exclusive knowledge in the first instance—neither the RTC nor the court could be expected to divine this. In short, to the degree that the distinction mattered to its Fifth Amendment theory, LB Credit could and should have parsed out the breakdown of payments in the summary judgment briefing. Its failure to do anything of the sort until after Judge Lindberg's adverse ruling is more likely explained, in our view, by a belated switch in theories than by a reasonable expectation that the court would readily intuit the capital recovery distinction and surprise when it did not.

Although Judge Lindberg did not explicitly rest his denial of the motion on the ground that LB Credit was pursuing a new or modified theory, we believe his ruling can be justified on this ground alone. *See, e.g., Wildey v. Springs*, 47 F.3d 1475, 1488–89 (7th Cir.1995); *Mendelovitz v. Vosicky*, 40 F.3d 182, 187 (7th Cir.1994) (appeals court may affirm judgment on any ground that is supported by the record and has not been forfeited). This was not a case in which the court had erred in its understanding of either the law or the facts, nor was it a case of newly discovered evidence, such that modification of the judgment was in order. LB Credit merely took advantage of the court's fortuitous choice of words to offer an entirely new view of the case.

It would be imprudent in these circumstances for us to take up the merits of the lost capital theory. The record is necessarily one-sided as to the calculation of LB Credit's capital investment in the leased equipment, as the RTC never had the opportunity to explore the assumptions and methodology underlying LB Credit's computations. It therefore would not be fair to the RTC nor would it do justice to the argument to decide a constitutional question on a record that is incomplete.

### III.

The assertions that LB Credit attempted to raise by way of the Rule 59(e) motion were waived for the failure to raise them prior to the entry of judgment. Judge Lindberg therefore by no means abused his discretion in denying the motion.

AFFIRMED.