In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1480

EDGEWOOD MANOR APARTMENT
HOMES, LLC, and SOUTHLAND
MANAGEMENT CORPORATION,

*Plaintiffs-Appellants,*

*v.*

RSUI INDEMNITY COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 08-C-920 — **Charles N. Clevert, Jr.**, *Judge.*

No. 12-1508

SOUTHLAND MANAGEMENT
CORPORATION,

*Plaintiff-Appellant,*

*v.*

RSUI INDEMNITY COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 11-C-626 — **Charles N. Clevert, Jr.**, *Judge.*

ARGUED SEPTEMBER 5, 2012 — DECIDED OCTOBER 25, 2013

Before POSNER, KANNE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* These consolidated appeals raise an interesting question of insurance law: Does a claim for "replacement cost" proceeds under a property-insurance policy survive the insured's sale of the damaged property in its unrepaired state? The issue is buried under layers of transactional and procedural complexity; we will simplify where possible. Edgewood Manor Associates, Ltd. ("Edgewood Associates") owned an apartment complex in Gulfport, Mississippi, that was insured against property damage under a policy issued by RSUI Indemnity Company. In the event of a covered loss, RSUI promised to pay "actual cash value" proceeds and also "replacement cost" proceeds. Southland Management Corporation, a limited partner and the managing general partner of Edgewood Associates, was the named insured.

The apartment complex was badly damaged in Hurricane Katrina. RSUI paid actual-cash-value proceeds and the parties began negotiating for the additional replacement-cost proceeds. In the midst of these negotiations, Southland contracted to sell the property in its unrepaired state to

Edgewood Manor Apartment Homes, LLC ("Edgewood Manor"), a new company formed by a Wisconsin-based real-estate firm for the purpose of purchasing the apartment complex. Before the closing Southland notified RSUI of its intention to sell the property and assign the claim for replacement-cost proceeds to the buyer. RSUI responded that if Southland sold the property before completing repairs, it could not recover replacement-cost proceeds and neither could the buyer. Undeterred, Southland went ahead with the sale.

Southland and Edgewood Manor, the buyer, then sued RSUI in federal court in Wisconsin seeking a declaration that the insurer was obligated to pay the claim. Southland later brought a related breach-of-contract action in federal court in Mississippi, which was transferred to Wisconsin and has proceeded along with the earlier-filed case. In the meantime Edgewood Manor repaired the property.

The litigation continued for years on the assumption that the replacement-cost claim had been assigned to Edgewood Manor along with the sale of the property. After much proce-dural wrangling, the truth finally came out: The insurance claim had not been assigned after all. The district court dismissed both cases.

We affirm in part and reverse in part. In the absence of an assignment, Edgewood Manor lacks standing to sue RSUI, so its claim was properly dismissed. Southland, on the other hand, still owns the replacement-cost claim and remains a proper plaintiff. Southland had an insurable interest when the policy was issued and at the time of the loss; the sale of the property in its unrepaired state did not extinguish its right to

recover on the mature claim. Although the policy specifies that replacement-cost proceeds will not be paid until the property is repaired, it does not require that the insured complete the repairs itself. Southland's claims for declaratory judgment and breach of contract should not have been dismissed.

## I. Background

Edgewood Associates, a limited partnership, owned the apartment complex in Gulfport, and Southland was a limited partner, managing general partner, and the named insured under an excess policy issued by RSUI covering damage to the property. The policy incorporated the terms of the primary policy on the property and provided excess coverage for the period December 1, 2004 to December 1, 2005. In the event of a covered loss, the policy obligated RSUI to pay Southland on an actual-cash-value basis and also on a replacement-cost basis.

By way of background, actual-cash-value insurance will compensate an insured for the value of damage to the covered property in its depreciated state. For example, if property worth $10,000 deteriorates and is worth only $8,000 at the time of loss, the insured will receive $8,000. Because actual-cash-value proceeds may not be sufficient to permit an insured to repair or rebuild the damaged property to its original specifications, insurers offer optional replacement-cost coverage for the full cost of repair or replacement. Southland purchased this extra coverage for the apartment complex.

RSUI's obligation to pay on a replacement-cost basis came with two qualifiers, however. The policy provides:

    d.  We will not pay on a replacement cost basis for any loss or damage:

        (1)  Until the lost or damaged property is actually repaired or replaced; and

        (2)  Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

The policy also prohibits the insured from assigning the policy: "Your rights and duties under this policy may be not transferred without our written consent except in the case of death of an individual named insured."

On August 29, 2005, Hurricane Katrina heavily damaged the apartment complex. The primary insurer paid its coverage limits for the actual cash value of the damage, and RSUI paid the excess actual cash value. Southland and RSUI then began negotiating over the replacement-cost proceeds. Southland did not repair the property, however. Instead, in mid-2007 Southland and Edgewood Associates entered into an agreement to sell the apartment complex to Gorman & Co., Inc., a Wisconsin real-estate firm. The purchase agreement was revised many times to address (among other complexities) the evolving issue of the replacement-cost proceeds under the RSUI excess policy.

As amended on November 26, 2007, the purchase agreement included a warranty by Edgewood Associates that the insurance payment would be at least $3.1 million. This version of the agreement also provided that Edgewood Associates would pay or assign $1.1 million of the insurance proceeds to Gorman at closing and would donate the remaining $2 million

to "Impact Seven," a nonprofit organization, with the understanding that the nonprofit would lend the money to the buyer. The transaction apparently was structured this way for tax purposes.

Before the sale closed, Southland notified RSUI that it intended to sell the property and assign its replacement-cost claim or otherwise transfer its right to payment to the buyer. RSUI responded that an assignment or other transfer was prohibited under the policy's "no transfer" provision. Southland countered that the "no transfer" provision only prohibited an assignment of the policy itself, not the mature claim to replacement-cost proceeds.

This dispute was never resolved, but the transaction was restructured again, apparently in response to the continuing uncertainty over payment of the insurance proceeds. Gorman assigned its right to purchase the property to Edgewood Manor, a newly created entity for which Gorman was the managing partner. The parties then amended the purchase agreement to rearrange the distribution of the insurance recovery. Under the amended agreement, Edgewood Manor would receive the proceeds through a circuitous series of transactions. Omitting details not relevant here, under the final iteration of the agreement, Southland retained ownership of the replacement-costs claim but appointed Edgewood Manor as its attorney-in-fact with respect to negotiations with RSUI. Southland promised to direct RSUI to pay the replacement-cost proceeds to Mississippi Title Company as escrow agent. Mississippi Title would then disburse the proceeds to Impact

Seven, the nonprofit previously designated as the conduit, and Impact Seven would lend the money to Edgewood Manor.

The restructured deal closed on February 12, 2008, and Edgewood Associates conveyed the property to Edgewood Manor. To wrap up loose ends, the next day Edgewood Manor and Impact Seven entered into a contract under which the nonprofit promised to lend the insurance proceeds to Edgewood Manor.

In the meantime, the question of replacement-cost proceeds remained unsettled. In March 2008 RSUI—apparently unaware that the sale already had occurred—advised Southland that no replacement-cost payments would be due unless and until repairs or replacements were made. The insurer took the position that until Southland made repairs or replacements, it would have no mature claim to assign. Months later Gorman (indirectly, the new property owner) took over negotiations, notifying RSUI that the sale was complete. Gorman did not, however, explain the final terms of the sale. In particular, Gorman never explained that the transaction did not include an assignment of the insurance claim but instead involved a promise by Southland to donate the proceeds to Impact Seven for Edgewood Manor's benefit. RSUI continued to deny any obligation to make replacement-cost payments.

With negotiations at an impasse, in October 2008 Southland and Edgewood Manor sued RSUI in federal district court in Eastern Wisconsin seeking a declaration that RSUI owed the insurance proceeds; they also sought damages for bad-faith delay or denial of the claim. The case proceeded to cross-motions for summary judgment. RSUI argued that Edgewood

Manor was not a proper plaintiff because it had not produced evidence of an assignment, and alternatively, that any assignment was invalid in light of the "no transfer" provision in the policy. RSUI also argued that Southland lost its insurable interest when it sold the property. Finally, RSUI argued that Southland was not entitled to replacement-cost proceeds because it had not repaired the property prior to the sale.

With the summary-judgment motions pending, Southland filed a second action in federal court in Mississippi asserting a breach-of-contract claim against RSUI. By this time Edgewood Manor had repaired the property and the breach-of-contract claim ripened. The Mississippi case was transferred to the Eastern District of Wisconsin and proceeded in tandem with the declaratory-judgment/bad-faith suit.

The district court eventually ordered the parties to clarify the complicated facts surrounding the sale of the apartment complex. At that point nothing in the record established that Southland had, in fact, assigned the claim for replacement-cost proceeds to Edgewood Manor, so the question of who owned the claim remained unclear. In response Southland and Edgewood Manor submitted an affidavit from Edward Matkom, Gorman's general counsel, explaining that Edgewood Associates owned the property at the time of the loss and that Southland was its managing partner and the named insured under the excess policy. But the Matkom affidavit was vague on the precise nature of Edgewood Manor's interest in the insurance claim, saying only that "Edgewood Manor is the current title owner of the Property, and in accordance with the

terms of the sale of the Property[,] [has] an interest in the proceeds that are the subject of this litigation."

Although it did not resolve the mystery of the supposed "assignment," the Matkom affidavit was enough to convince the district judge that Edgewood Manor had an interest in the insurance proceeds sufficient to support its standing to sue. The judge also concluded that Southland's status as a named insured, coupled with the possibility that it retained a partial interest in the proceeds after the still-undisclosed "assignment," was enough to support Southland's standing. The judge concluded that the plaintiffs' entitlement to replacement-cost proceeds could not be decided on summary judgment but that RSUI was entitled to judgment on the bad-faith claim. On March 23, 2011, the court entered an order denying the plaintiffs' summary-judgment motion, granting RSUI's motion with respect to the bad-faith claim only, and setting a status conference for the following week.

At that conference held on March 30, RSUI reminded the court that it still did not know who owned the insurance claim because evidence of an assignment had not been produced. The judge instructed RSUI to propound a request for this evidence by letter within a week, with a response due from the plaintiffs by the end of the month. These instructions did not produce the desired clarity. RSUI's attorney sent a letter requesting all documents pertaining to the purported assignment. Counsel for the plaintiffs responded that the information was irrelevant.

On May 5, the next scheduled status conference, RSUI again requested evidence of the assignment, arguing that without

proof of an assignment, it had no obligations to either party because Edgewood Manor would not be in privity and Southland could not recover because it had not repaired the property prior to the sale. The judge ordered the plaintiffs to "provide to RSUI all materials respecting the sale, assignment or transfer of rights or proceeds under RSUI's policy relevant to this action and discoverable in this case." In response Southland and Edgewood Manor filed a copy of "Amendment Eight" to the purchase agreement setting forth the final arrangements regarding the insurance proceeds. Counsel's transmittal letter stated that "this is the only relevant document related to the terms of the allocation of proceeds between Southland and Edgewood Manor."

At the next status conference on July 13, 2011, the issue of the assignment was finally resolved. The judge noted that Amendment Eight contained no reference to an assignment of the insurance proceeds and questioned the plaintiffs' attorney about the exact nature of Edgewood Manor's interest in the declaratory-judgment action. Counsel responded that Edgewood Manor's interest was based "primarily" on the contents of Amendment Eight (and to a lesser extent on earlier amendments) and also on counsel's personal conversations with his clients. The judge was understandably dissatisfied with this nonresponsive answer and pressed the question of Edgewood Manor's standing in light of the absence of an assignment. RSUI jumped in, asserting that it was now clear that Edgewood Manor had no direct interest in the replacement-cost proceeds because there had been no assignment of the claim. Instead, Southland retained the claim, and Edgewood Manor's interest was at best indirect through a

series of promised payments culminating in a donation to Impact Seven, which would lend the money to Edgewood Manor.

At this point the district court called a recess and an off-the-record discussion ensued. When the proceedings resumed 11 minutes later, RSUI moved to dismiss the declaratory-judgment action, essentially reiterating the argument it had made in its summary-judgment motion: (1) without an assignment Edgewood Manor lacked a direct interest in the insurance proceeds and thus had no standing to sue RSUI; and (2) Southland had no right to recover replacement-cost proceeds because it had not repaired the apartment complex before selling it. The judge granted the motion on the spot and invited a dispositive motion in the companion breach-of-contract action.

Southland and Edgewood Manor moved to vacate the judgment under Rule 59(e) of the Federal Rules of Civil Procedure, submitting another affidavit from Matkom and copies of the purchase agreement; Amendments One, Three, Four, and Eight; and a document called "Loan Agreement Number 2." In the meantime RSUI moved to dismiss the breach-of-contract action based on the preclusive effect of the court's ruling in the declaratory-judgment action. The court declined to consider the plaintiffs' additional evidence because it was not newly discovered and denied the Rule 59(e) motion. In a separate order, the court construed RSUI's motion to dismiss the breach-of-contract action as a motion for judgment on the pleadings, *see* FED. R. CIV. P. 12(c), and granted it. This appeal followed.

## II. Discussion

The plaintiffs raise multiple procedural and substantive claims of error. For the most part, our review is de novo. As we explain, the district court's dismissal of the declaratory-judgment action is best construed as an order granting a new or renewed motion for summary judgment; we review a decision granting summary judgment de novo. *Minn. Life Ins. Co. v. Kagan*, 724 F.3d 843, 848 (7th Cir. 2013). The same standard of review applies to the order entering judgment on the pleadings in the breach-of-contract action. *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013). We review the denial of the plaintiffs' Rule 59(e) motion deferentially, for an abuse of discretion only. *Blue v. Hartford Life & Accident Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012). The parties agree that the claims are governed by Mississippi law.

### A. Procedural Arguments

The plaintiffs raise a plethora of procedural challenges to the district court's orders dismissing their declaratory-judgment action and denying their Rule 59(e) motion. The court did not specifically characterize the dismissal order, but the record suggests that it was a summary judgment entered on a new or renewed oral motion from RSUI. Under the rules applicable to summary judgment, we detect no procedural error.

The plaintiffs' first objection is that the motion was not in writing. They rely on the general rule that "[a] request for a court order must be made by motion" and "[t]he motion

must … be in writing unless made during a hearing or trial." Fed. R. Civ. P. 7. RSUI's motion plainly falls within the "unless" clause; counsel made the motion "during a hearing," so the writing requirement did not apply. Moreover, the status conference was scheduled for the express purpose of addressing dispositive issues of law and fact that had been under discussion for some time, so there can be no complaint of unfair surprise. The existence of an assignment and its effect on the claim for replacement-cost proceeds had been key issues in the cross-motions for summary judgment. The court declined to resolve these issues on summary judgment, so they remained very much in play.

At the May 5 status conference, RSUI advised the court that the plaintiffs still had not produced evidence of an assignment and argued that "absent proof of assignment prior to or at the time of the sale, there is no obligation to pay insurance proceeds, period." The district court agreed and ordered counsel to produce the requested documents. The judge gave everyone notice of what would come next: "We will schedule this matter for further proceedings promptly 45 days down the road, and we'll determine *at that time* whether or not this case can be resolved by motion, on documents, or whether or not the better course would be to have a hearing or trial." (Emphasis added.) Under these circumstances, and because they were in exclusive possession of the relevant facts about the lack of an assignment, the plaintiffs should have anticipated RSUI's oral motion.

The plaintiffs next object that RSUI's motion was not accompanied by a written brief. They invoke Local Rule 7,

which provides that "[e]very motion … must be accompanied by … a supporting memorandum and, when necessary, affidavits, declarations, or other papers; or … a certificate stating that no memorandum or other supporting papers will be filed." E.D. WIS. CIV. L.R. 7. The plaintiffs also rely on the local rule pertaining to summary-judgment motions:

> With each motion for summary judgment, the moving party must file: (A) a memorandum of law; (B) a statement setting forth any material facts to which all parties have stipulated; (C) a statement of proposed material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law; … (iii) failure to submit such a statement constitutes grounds for denial of the motion; and (D) any affidavits, declarations, and other materials referred to in Fed. R. Civ. P. 56(c).

E.D. WIS. CIV. L.R. 56(b).

Although the moving party's failure to file a supporting memorandum "is sufficient cause for the [c]ourt to deny the motion," E.D. WIS. CIV. L.R. 7(d), we have repeatedly held that the district court has broad discretion to require strict compliance with local rules or to relax the rules and excuse noncompliance. *E.g.*, *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013). In other words, "litigants have no right to demand strict enforcement of local rules by district judges." *Id.* The district court was not required to wait for further briefing; the legal issues were already fully briefed. Once the facts surrounding

the transaction were clarified, the matter was ready for decision.

The plaintiffs also argue that RSUI's oral motion violated Rule 56 because it was not "served" at least 10 days before the hearing. This argument is frivolous; the plaintiffs rely on an obsolete version of Rule 56(c). The rule was amended in 2009 to remove the 10-day service requirement and substitute a new briefing schedule. *See* FED. R. CIV. P. 56(c) (rev. ed. West 2009, eff. Dec. 1). The rule was rewritten again in 2010, eliminating the timing requirement altogether. FED. R. CIV. P. 56(c) (rev. ed. West 2010, eff. Dec. 1).[1]

The plaintiffs insist that they were entitled to at least *some* kind of advance notice as a matter of due process, referring opaquely to "the due process requirements noted by the U.S. Supreme Court in *Celotex*." But *Celotex* does not refer to due process at all; instead, it explains the requirements of Rule 56. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–28 (1986). It is true that for sua sponte summary judgments, Rule 56(f) specifically requires "notice and a reasonable time to respond." This was not a sua sponte summary judgment.

Finally, the plaintiffs contend that the district court was wrong to disregard the additional evidence submitted with their Rule 59(e) motion: the second Matkom affidavit and the numerous attached exhibits (the purchase agreement; Amendments One, Three, Four, and Eight; and the Loan Agreement Number 2). But a Rule 59(e) motion is not a fresh opportunity

---

[1] The 2010 Amendments became effective December 1, 2010, and therefore were applicable to RSUI's July 13, 2011 oral summary-judgment motion.

to present evidence that could have been presented earlier. *See Sigsworth v. City of Aurora*, 487 F.3d 506, 512 (7th Cir. 2007); *LB Credit Corp. v. Resolution Trust Corp.*, 49 F.3d 1263, 1267 (7th Cir. 1995). To prevail on a Rule 59(e) motion, the moving party "must clearly establish (1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment." *Blue*, 698 F.3d at 598 (internal quotation marks omitted).

The second Matkom affidavit and its attachments were obviously in the plaintiffs' possession and should have been disclosed earlier. Indeed, RSUI repeatedly asked for documents relating to the precise nature of Edgewood Manor's interest in the insurance claim; the court had ordered this evidence produced and the plaintiffs had persistently insisted that it was irrelevant. This evidence was hardly "newly discovered," as Rule 59(e) requires; instead, it was belatedly produced.

Running through the plaintiffs' procedural arguments is a vague complaint about unfairness, but this objection rings hollow under the circumstances here. Having evaded the matter for so long, the plaintiffs cannot have been surprised when the court entertained an immediate dispositive motion once the truth about the nonexistent "assignment" came to light. We find no procedural error in the district court's decisions.

**B. Substantive Arguments**

   **1.** *Edgewood Manor*

Edgewood Manor maintains that even without an assignment or other direct entitlement to the replacement-cost proceeds, it has standing to sue RSUI for declaratory judgment. We disagree. To establish its standing, Edgewood Manor must show that it has an " 'injury in fact'—an invasion of a legally protected interest which is … concrete and particularized"— and that its injury is fairly traceable to the defendant's conduct and likely to be redressed by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). These are the constitutional minimums for standing to sue in federal court; there are also "prudential" standing requirements, one of which is that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see also Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008). Prudential-standing rules, unlike constitutional ones, are not jurisdictional and therefore may be disregarded in certain circumstances. *See Warth*, 422 U.S. at 500–01 (identifying various situations in which a litigant may assert rights of third parties); *see also Rawoof*, 521 F.3d at 757.

"The party invoking federal jurisdiction bears the burden of establishing these elements[,] … [and] each element must be supported … with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561 (citations omitted). At the summary-judgment stage, "the plaintiff can no longer rest on … 'mere allegations,' but must

'set forth' by affidavit or other evidence 'specific facts.' " *Id.* (citations omitted).

There is no question that Edgewood Manor lacked a direct interest in the replacement-cost proceeds under the RSUI excess policy. Contrary to the assumption that prevailed during most of the litigation, the replacement-cost claim was never assigned to Edgewood Manor when it purchased the property. Instead, Southland retained the claim and promised that the proceeds would be paid to the Mississippi Title Company, which in turn would disburse the money to Impact Seven, which would loan the money to Edgewood Manor. Although this indirect interest may be sufficient to establish constitutional standing, *see Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011), Edgewood Manor plainly lacks standing under the prudential rule that a litigant cannot sue to enforce the legal rights of another.

The relief sought in the declaratory-judgment action is a ruling regarding the rights of the parties to the RSUI excess insurance policy. Southland is the named insured and continues to own the replacement-cost insurance claim. Edgewood Manor apparently has a contractual right to recover *from Southland* some or all of the proceeds Southland may receive from RSUI on the replacement-cost claim (albeit through conduits). But the declaratory-judgment action concerns only the legal rights of the parties to the excess policy. Edgewood Manor did not receive an assignment of the insurance claim when it purchased the apartment complex and may not sue to

enforce Southland's rights against RSUI.[2] *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 540–42 (7th Cir. 2012). The district court properly dismissed Edgewood Manor's claim for lack of standing.

### 2. *Southland*

RSUI argues that Southland cannot recover replacement-cost proceeds because it lost its insurable interest when it sold the property. An elementary principle of insurance law, in Mississippi and elsewhere, is that the insured must have an insurable interest in the subject of the policy.[3] "The reason for

---

[2] Edgewood Manor suggests that the analysis must be different in a declaratory-judgment action because one of the purposes of the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02 (2006), is to avoid multiplicity of suits by having all interested parties joined in the action. The argument seems to be that in enacting the Declaratory Judgment Act, Congress modified the prudential-standing rule prohibiting litigants from asserting the rights of others. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules."). If that is Edgewood Manor's argument, it is misplaced. The Declaratory Judgment Act provides a cause of action only to those seeking a declaration of their own legal rights. 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, … any court of the United States … may declare the rights and other legal relations *of any interested party seeking such declaration* … ." (emphasis added)). This action seeks a declaration of rights under the excess policy, so Edgewood Manor is necessarily seeking to enforce the rights of another: Southland, the named insured and owner of the replacement-cost claim.

[3] In some states an insurable interest is required by statute. In Mississippi

(continued...)

the rule requiring an interest in property upon which insurance is sought is to prevent the coverage from becoming a wagering contract contrary to public policy." *Se. Fid. Ins. Co. v. Gann*, 340 So. 2d 429, 434 (Miss. 1976). The requirement also guards against moral hazard: "To allow persons without insurable interests to procure such insurance would create economic incentives in such persons to cause loss." JEFFREY JACKSON, MISSISSIPPI INSURANCE LAW AND PRACTICE § 4:1 (2012).

Where, as here, the subject of the insurance policy is property, the insured must have an insurable interest in the covered property. It need not be a strictly legal interest in the sense of title; the fact that the insured will suffer an economic loss if the property is damaged will suffice even if the insured lacks an ownership interest in the property. *Necaise v. U.S.A.A. Cas. Co.*, 644 So. 2d 253, 258 (Miss. 1992) ("All that is required for one to have an insurable interest in property is that the insured will suffer an economic loss if the property is destroyed."); *Gann*, 340 So. 2d at 433 ("[The insured] had an insurable interest in the property even though the legal title was elsewhere. He was subject to economic loss at the time the policies were issued if the building were destroyed.").

RSUI argues that Southland lost its insurable interest after it sold the apartment complex. But Mississippi law does not require that an insured continue to hold its interest in the

---

[3] (...continued)

an insurable interest for life-insurance policies is required by section 83-5-251 of the Mississippi Code, but the insurable-interest requirement for property insurance apparently remains a feature of common law only.

damaged property through the filing of a lawsuit; the insurable interest is measured either at the time of policy formation or at the time of loss. As a leading treatise on insurance law explains:

> There is authority that the insurable interest in property must exist at the time the insurance contract is entered into while other cases hold that since the contract is one of indemnity, the insurable interest must exist when loss is sustained. The view that the interest must exist both at the inception of the contract and when the loss is sustained has also found expression.

3 LEE R. RUSS IN CONSULTATION WITH THOMAS F. SEGALLA, COUCH ON INSURANCE § 41:18 (3d ed. 2011). Mississippi appears to follow the rule that the insured must have an insurable interest at the time of contract formation. *See Necaise*, 644 So. 2d at 257 ("[A]n insurable interest must exist in an insured when the contract is entered for it to be effective." (alteration in *Necaise*) (internal quotation marks omitted)); *Gann*, 340 So. 2d at 433 ("[T]he general rule [is] that an insurable interest in property must exist in an insured when the contract is entered for it to be effective.").

Whether measured at the time of contract formation *or* the time of loss, the parties have identified no authority suggesting that any state, let alone Mississippi, requires that an insured continue to maintain an insurable interest in the property while the claim is being negotiated and through litigation. That rule would be hard to justify. Neither of the rationales for the insurable-interest requirement—preventing wagering contracts

and avoiding contracts that create incentives to cause loss—has any force *after* the loss has occurred.

There is no dispute that Southland had an insurable interest in the Gulfport property when it purchased the policy *and* at the time of the loss. Southland was a limited partner and the managing general partner of Edgewood Associates, the owner of the apartment complex, so any fortuitous damage to the property had a direct bearing on Southland's economic fortunes, both at the time of policy formation and when the property was damaged in Hurricane Katrina. That is enough. *See Necaise*, 644 So. 2d at 258; *Gann*, 340 So. 2d at 433. Indeed, RSUI tacitly admitted that Southland had an insurable interest by making actual-cost-value payments to Southland. The fact that Southland and Edgewood Associates later sold the property—after the loss occurred and prior to suit—is irrelevant.

RSUI also argues that it has no obligation to pay replacement-cost proceeds because Southland sold the property in its unrepaired state. This argument reads the policy as if it required the insured to repair the property itself. The policy nowhere contains that requirement. To repeat, the relevant provision conditioning recovery is as follows:

> d.  We will not pay on a replacement cost basis for any loss or damage:
>
> (1) Until the lost or damaged property is actually repaired or replaced; and

> (2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

This language does not defeat Southland's claim. To the contrary, the conditions are written in the passive voice, leaving the subject unspecified. This drafting choice suggests that it does not matter who repairs the property. *See* BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 659 (3d ed. 2011) ("[T]he passive voice has its occasional legitimate uses—usually, when the actor is either unimportant or unknown … .").

If RSUI wanted to impose a prerequisite that the insured repair or replace the property itself, it could have written the conditions as follows:

> d. We will not pay on a replacement cost basis for any loss or damage:
>
> (1) Until you actually repair or replace the lost or damaged property;
>
> (2) Unless you make the repairs or replacement as soon as reasonably possible after the loss or damage.

Or it could have stated clearly—as it did in the "tenants' improvements and betterments" provision located nearby in the policy—that it would not pay on a replacement-cost basis for loss or damage if others pay for repairs or replacement.

More specifically, section 3d.(4) governs replacement-cost coverage for loss or damage to "tenants' improvements and betterments":

> With respect to tenants' improvements and betterments, the following also apply:
>
> …
>
> (4) We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

This language expressly excludes recovery of replacement-cost benefits for damage to tenants' improvements and betterments *if others pay for repairs or replacement*. The inclusion of this explicit limitation on recovery of replacement-cost proceeds for damage to "tenants' improvements and betterments" suggests that the same limitation cannot be found by implication in the more general provision governing replacement-cost coverage. Stated differently, the limitation in section d.(4) would be superfluous if sections d.(1) and d.(2) already required that the insured make repairs or replacements itself with respect to *all* replacement-cost claims.

RSUI insists that although the policy language does not expressly require the insured to repair the property itself, a "repair it yourself" requirement should be judicially inferred in order to avoid conferring a windfall on the insured. No Mississippi authority has adopted that construction; as far as we can tell, there is no Mississippi caselaw on this issue at all. RSUI relies on three nonauthoritative cases that have adopted this gloss. *See Athena Rest., Inc. v. Sheffield Ins. Co.*, 681 F. Supp.

561 (N.D. Ill. 1988); *Paluszek v. Safeco Ins. Co. of Am.*, 517 N.E.2d 565 (Ill. App. Ct. 1987); *Harrington v. Amica Mut. Ins. Co.*, 645 N.Y.S.2d 221 (N.Y. App. Div. 1996). These courts reason that allowing an insured to sell the property in its unrepaired state and later recover repair costs incurred by the buyer does more than simply indemnify the insured against loss; it allows the insured to profit. To avoid a "windfall," these courts implied a "repair it yourself" requirement.

We see several flaws in this reasoning. First, replacement-cost insurance is specifically designed as more than a pure indemnity contract. As one court has explained:

> The actual cash value policy is a pure indemnity contract. Its purpose is to make the insured whole but never to benefit him because a fire occurred. … Replacement cost coverage, on the other hand, reimburses the insured for the full cost of repairs, if he repairs or rebuilds the build-ing, *even if that results in putting the insured in a better position than he was before the loss.*

*Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 352 (Ind. 1982) (emphasis omitted and added) (citations omitted). The "windfall" arises because the insured receives compensation for depreciation that occurred prior to the loss, but that's an inherent feature of this kind of coverage.

Suppose an owner purchases a house with four bedrooms for $100,000. After some years its condition deteriorates and the structure is worth only $75,000. If a fire were to destroy the house, the owner is made whole when her insurer pays the actual-cost value of the damage—$75,000—a measure of loss

that deducts for depreciation. Maybe the owner can rebuild a four-bedroom house for that amount using lower-quality materials, or maybe she can rebuild the house to standard-quality specifications but with only three bedrooms. Either way the repaired or rebuilt structure is worth the same as the damaged one was at the time of the loss, and the insured is made whole in the sense meant by actual-cost indemnity insurance.

But if the insured purchases replacement-cost coverage, her recovery is measured by reference to the cost of rebuilding the house to its original specifications without a deduction for depreciation. This leaves her better off—she owns a new house rather than an older deteriorated one—but that's the nature of replacement-cost coverage. RSUI's argument about "windfall" does not support an implied "repair it yourself" requirement.

RSUI argues that an owner who repairs or replaces the damaged property experiences an additional "loss," but the same is not true if the owner sells the property in its unrepaired state. It's not clear that this distinction makes a difference here. No doubt the sale price of the unrepaired property will reflect the cost to rebuild, a measure of loss that the owner has insured against by paying higher premiums for replacement-cost coverage. We're not convinced that this distinction is enough to justify a judicially implied "repair it yourself" requirement, at least in the absence of clearer policy language supporting it.

So why bother requiring that a property be repaired at all if not to ensure that the insured does not enjoy a windfall? The repair requirement has a more concrete function: It ensures

that replacement cost is valued accurately. In the absence of actual repair, the claim would be based on estimates; when actual repairs are completed, the replacement-cost valuation becomes certain and verifiable. The reasonable-time condition adds a requirement of promptness.

The cases RSUI cites are not binding in Mississippi, and one is simply inapplicable here. *Athena Restaurant* involved a "tenants' improvements and betterments" provision that expressly required the insured to complete the repair or replacement itself. 681 F. Supp. at 562. As we have noted, the RSUI policy contains a similar provision, which suggests that the policy's general replacement-cost coverage should not be limited in a similar way by judicial implication. It is true that the Illinois Appellate Court's decision in *Paluszek* supports RSUI's position, 517 N.E.2d at 567–69, and the Appellate Division of the New York Supreme Court followed *Paluszek* in *Harrington*, 645 N.Y.S.2d at 223–25. But there is persuasive authority pointing in the opposite direction as well. In *Ruter v. Northwestern Fire & Marine Insurance Co.*, 178 A.2d 640, 643 (N.J. Super. Ct. App. Div. 1962), the New Jersey Appellate Division interpreted a similar repair-or-replacement requirement and held that the policy did not require that the insured repair or replace the property himself. On balance, we are not convinced that the Mississippi courts would read a "repair it yourself" requirement into a replacement-cost provision in the absence of specific policy language imposing that condition on recovery. No such language is present here.

Our conclusion requires that we reverse the summary judgment in favor of RSUI on Southland's declaratory-

judgment and breach-of-contract actions; the claims concern the same subject matter and are controlled by the same legal principles. Other issues remain open on remand. The policy requires that the property be repaired within a reasonable time, and that subject was not explored in the district court or here. There may be other coverage defenses as well.

Judgment was properly entered for RSUI on the bad-faith claim, however. The district court's decision was made on the understanding that the replacement-cost claim had been assigned to Edgewood Manor. We now know that the court's belief was wrong, through no fault of its own. So although we affirm the judgment for RSUI on the bad-faith claim, we do so on a somewhat different analysis.

Mississippi recognizes two kinds of extracontractual damages against insurers for bad-faith denial or delay in processing a claim. Punitive damages are available where an insurer (1) lacks any legitimate or arguable basis for its denial or delay of the claim; and (2) acts either (a) with malice, or (b) with gross negligence or reckless disregard for the rights of others. *See Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1095 (Miss. 1996). Mississippi also allows a lesser measure of extracontractual damages—attorney's fees, costs, and damages for emotional harm—where an insurer (1) lacks any legitimate or arguable basis for its denial or delay, and (2) acts with some lesser standard of culpability. *See Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290, 295–96 (Miss. 1992). So both forms of extracontractual recovery have at least two elements in common: (1) the absence of an arguable basis to deny or delay the claim, and (2) some level of culpability.

In addition, the cases on extracontractual damages for bad faith appear to presuppose a third, implicit element of the claim: that the insured actually prevail on its claim for recovery under the insurance contract, whether by adjudication or the insurer's payment of benefits. A leading treatise on insurance law in Mississippi explains that this is an element for extracontractual damages. JACKSON, *supra*, § 13:2 ("[T]he insured must first demonstrate that the claim or obligation was in fact owed. Prevailing on the contract claim is a condition precedent to prevailing on the claim of bad faith."); *see also Essinger v. Liberty Mut. Fire Ins. Co.*, 529 F.3d 264, 271 (5th Cir. 2008) (citing the treatise's discussion approvingly). The Fifth Circuit also has intuited this requirement. *See O'Malley v. U.S. Fid. & Guar. Co.*, 776 F.2d 494, 500 (5th Cir. 1985) ("[The insured] has not presented, nor have we found, any Mississippi case allowing an insured to recover against an insurance company for alleged bad faith in handling a claim if the insured does not prevail on the issue of coverage."). We are aware of no Mississippi decisions allowing extracontractual damages in the absence of an insurer's payment of a claim or an adjudication of coverage. Put simply, an insured cannot show that an insurer's denial of a claim was *unjustifiably* wrong if it cannot show that the denial was wrong at all.

A threshold complication here is that the claim presented to RSUI for payment is materially different from the claim on which Southland may or may not eventually prevail. Southland initially told RSUI that it planned to sell the apartment complex and assign its claim for replacement-cost proceeds to the buyer of the property. All subsequent communications with RSUI were made by representatives for Gorman on behalf

of Edgewood Manor, the buyer. So RSUI had every reason to believe it was evaluating Edgewood Manor's claim, not Southland's. Furthermore, both Southland and Edgewood Manor pressed the claim while the property remained unrepaired, a key reason why RSUI refused to pay. These factual ambiguities are fatal to Southland's bad-faith claim. Until the ownership of the claim was clarified and repairs were made, RSUI had an arguable basis to resist making replacement-cost payments. Summary judgment was properly entered for RSUI on the bad-faith claim.

Accordingly, we AFFIRM the judgment in favor of RSUI on the bad-faith claim. We AFFIRM the judgment dismissing Edgewood Manor from the declaratory-judgment action for lack of standing. We REVERSE the judgment in favor of RSUI on the claim for declaratory judgment and the claim for breach of contract, and REMAND for further proceedings consistent with this opinion.