# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-60472

United States Court of Appeals
Fifth Circuit

**FILED**

July 21, 2016

Lyle W. Cayce
Clerk

SOUTHERN INSURANCE COMPANY,

Plaintiff - Appellant, Cross-Appellee

v.

AFFILIATED FM INSURANCE COMPANY; UNIVERSITY OF SOUTHERN MISSISSIPPI ALUMNI ASSOCIATION,

Defendants - Appellees, Cross-Appellants

Appeals from the United States District Court
for the Southern District of Mississippi

Before SMITH, BARKSDALE, and COSTA, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge.

To paraphrase T. S. Eliot's "The Hollow Men" (1925), this years-long stare-down between two insurers which covered the same property and risk, but for different insureds, ends not with a blink but *Erie* guesses. At issue is the extent *vel non* to which the insurers are liable. In that regard, these cross-appeals from cross-motions for summary judgment present a host of hotly-contested issues concerning the two policies, including loss-valuation, ambiguity, absurd-result, other-insurance, *pro rata* allocation of loss, and the coverage-limit to be used for one of the policies in making that allocation.

No. 15-60472

Southern Insurance Company (Southern) contends, *inter alia*, it is not liable because, under its policy's valuation provision, the loss by its insured, the University of Southern Mississippi Alumni Association (association), is "nothing" for coverage purposes.    Affiliated FM Insurance Company (Affiliated), the insurer for the University of Southern Mississippi (the university), contends Southern is fully responsible for the loss, and, in the alternative, contests the district court's *pro rata* allocation of liability. AFFIRMED.

I.

Southern and Affiliated provide coverage for the Ogletree House (house), an on-campus building at the university, located in Hattiesburg, Mississippi. The house is owned by the university; in 2009, it leased the house to the association for a 25-year term.

The lease recognized the "approximately $3,260,000.00" the association spent to renovate the house; assessed an annual rent of $1,000; and required, *inter alia*, the university to "continue to repair, maintain, upgrade[,] or modify [the house] to the extent the same is within the normal scope of established timelines of other state buildings on the campus".  The association, however, was responsible for any repairs exceeding that "normal scope or established timelines".   In the event repair was needed, the university was to select the contractor "[i]n cooperation with" the association.

The lease also required the association to obtain insurance for the house "against claims for . . . property damage", with the university to be listed in the policy as an "additional insured party".  Accordingly, the association obtained insurance from Southern; its policy's "Commercial Property Coverage Part" provided for a building-coverage limit of $4,112,000 and a personal-property-coverage limit of $250,000. The policy listed the association as named insured, but, contrary to the lease, did not list the university as an additional insured.

2

No. 15-60472

The policy did not mention the lease, nor did it specifically reference the lessor-lessee obligations between the university and the association.

Relevant to these appeals, the policy contained the following provisions governing Southern's coverage in the event of loss:

> 4. Loss Payment
>
>> a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:
>>
>> (1) Pay the value of lost or damaged property;
>>
>> . . .
>>
>> We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.
>>
>> . . .
>
> 7. Valuation
>
>> We will determine the value of Covered Property in the event of loss or damage as follows:
>>
>> a. At actual cash value as of the time of loss or damage, except as provided in . . . [subsection] e. below.
>>
>> . . .
>>
>> e. *Tenants' Improvements and Betterments* at:
>>
>> (1) Actual cash value of the lost or damaged property *if you make repairs promptly*.
>>
>> (2) A proportion of your original cost *if you do not make repairs promptly*.
>>
>> . . .
>>
>> (3) *Nothing if others pay for repairs or replacement*.

(Emphasis added.)  The provision for allocation of coverage between Southern and other insurers stated:

G. Other Insurance

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

As noted, in addition to the association's policy with Southern, the house was covered under the university's policy with Affiliated, which had a blanket limit of $500 million, covering multiple university buildings. A "Schedule of Values – General Property", listed those buildings and provided each building's value:  the house's was $3,962,662.

The Affiliated policy listed the university and several other entities not involved in this matter as named insureds; the association was not included. In short, Southern and Affiliated covered the same property (the house) for the same risk (property damage) but for two different insureds.

The Affiliated policy contained the following other-insurance clause:

8. Other Insurance / Excess Insurance / Underlying Insurance:

If there is other insurance covering the same loss or damage that is covered:

a) Under this policy; and

b) Any other policy;

Then this insurance will apply only as excess and in no event as contributing insurance, and

4

> then only after all other insurance has been
> exhausted, whether or not such insurance is
> collectible.

Apart from the competing other-insurance clauses in the two policies, they are silent as to priority of coverage.

In February 2013, the house was one of several university buildings damaged by a tornado. Affiliated paid the university for damage to several of those buildings, but did not initially pay for the damage to the house. According to an affidavit by an Affiliated adjuster, it refused payment because "it was believed [the house] was insured under a separate policy issued to" the association.

By letter to Affiliated that April, Southern disputed its policy provided primary coverage for the house. Citing the two policies' other-insurance provisions, Southern asserted "coverage [should] be shared on a pro-rata basis". By letter that May, Affiliated responded: the lease for the house required the association to obtain insurance; the association was not a named insured for Affiliated's policy; and Affiliated was not obligated to contribute any payment. Replying by letter that same month, Southern reiterated its position, requesting *pro rata* payment, "while reserving all rights between Southern and [Affiliated] to later negotiate or litigate the amount owed by each of them for this claim".

That November, the association submitted sworn proofs of loss to Southern for personal-property damage of $79,153.14, and building-repair costs of $3,246,121. The association listed Affiliated under the "Apportionment/Other Insurance" section of the proofs of loss, and noted the university was a named insured under that policy.

That same month, Southern paid the personal-property claim, but refused to do so for repairs to the house. In support of that coverage-denial, Southern stated, *inter alia*: the university, not the association, was

contractually required to pay for all repairs; any repair payments made by the association would be voluntary, and therefore not covered; and the association never presented a claim to Affiliated, despite listing it as other insurance in its proof of loss with Southern.

Only one week after its coverage-denial, Southern filed this declaratory-judgment action against Affiliated and the association (as well as the subsequently dismissed contractor which repaired the house). In its complaint, Southern asserted it had no obligation to pay for the property damage because the lease contemplated that the university was required to maintain and repair the house. In the alternative, it contended the policies' other-insurance clauses were mutually repugnant; therefore, a *pro rata* loss apportionment between Southern and Affiliated was appropriate. Affiliated counterclaimed, maintaining Southern provided primary coverage for the house.

In February and October 2014, Affiliated paid a total of $3,080,932.36 to the university for the repair costs for the house. In an interrogatory answer, Affiliated stated it "determined that it was in the best interest" of the university to make payment, and the association and Affiliated "reserved rights to pursue recovery of the payments from the . . . [a]ssociation and [Southern]". Along that line, in July 2014, the association: acknowledged Affiliated's payment to the university; assigned its rights against Southern to Affiliated; and remained a party in this action in order to enforce those rights. That assignment was based upon the association's "obligations under the lease to obtain property insurance which covers any loss" to the house.

Thereafter, Southern moved for summary judgment, asserting, *inter alia*: Affiliated paid for the repairs and, therefore, pursuant to Southern's above-discussed valuation clause, the association's loss was zero; and, under Mississippi law, Affiliated's voluntary payment of repair costs to the university foreclosed recovery from Southern. The association and Affiliated jointly cross-

No. 15-60472

moved for summary judgment, contending, *inter alia*:  the association had an obligation to repair the house pursuant to its lease; the lease's intent was for Southern to be the primary insurer; and the association presented a valid claim to Southern.  Alternatively, the association and Affiliated asserted that, if Affiliated was required to cover some of the costs, liability should be assessed *pro rata*, using the Affiliated policy's scheduled value of the house ($3,962,662), not the liability limit of that policy ($500 million, covering multiple buildings).

The court denied summary judgment for Southern, and granted it in part for the association and Affiliated.  Order, *S. Ins. Co. v. Affiliated FM Ins. Co.*, C.A. No. 2:13CV263-KS-MTP, 2015 WL 1636711, at *16 (S.D. Miss. 13 Apr. 2015).  As discussed *infra*, the court based its decision on, *inter alia*, the fact that Southern's policy did not expressly permit it to rely upon the others-paid valuation limitation (claiming the loss was zero) "at any time", unlike other policy clauses that contained such language.

In determining apportionment of liability, the court ruled the policies' other-insurance clauses were in conflict, because each purported to make its coverage excess to the other.  As a result, the court concluded the clauses were "mutually repugnant", and applied *pro rata* loss apportionment.  But, in performing that allocation, the court rejected the association and Affiliated's assertion that the scheduled value of the house, not the blanket policy limit, applied.  Accordingly, in comparing the limits of the Southern and Affiliated policies ($4,112,000 and $500 million, respectively) against the stated loss of $3,080,932.36, the court ruled:  Southern was liable for $25,337.58; Affiliated, for the remaining $3,055,594.78.

## II.

Southern appeals the denial of summary judgment; the association and Affiliated cross-appeal the *pro rata* liability ruling and the resulting amount assessed against Affiliated.  Southern contends, *inter alia*:  in the light of

Affiliated's payment to the university, Southern's policy unambiguously permits valuation of the association's loss at nothing; that payment was voluntary, and therefore not recompensable; and, in the alternative, liability should be assessed *pro rata.* The association and Affiliated assert, *inter alia*: Southern's coverage denial is impermissible "gamesmanship"; a *pro rata* loss apportionment is inappropriate, because the policies' other-insurance clauses are not implicated; but, assuming *pro rata* liability, the court erred in its loss calculation by using the Affiliated policy's $500 million limit of liability, instead of the far less scheduled value of the house. (Southern additionally contends the association and Affiliated, for the first time at oral argument, claimed Southern, in several respects, breached its contract. Although those contentions do not bear on our decision, we do not generally consider points raised for the first time at oral argument. *E.g., Bartel v. Alcoa S.S. Co.,* 805 F.3d 169, 174 (5th Cir. 2015).)

A summary judgment is reviewed *de novo. E.g., Cal-Dive Int'l, Inc. v. Seabright Ins. Co.*, 627 F.3d 110, 113 (5th Cir. 2010). Summary judgment is proper if the movant shows no genuine dispute as to any material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The evidence should be viewed in the light most favorable to the non-moving party, and this court should refrain from making credibility determinations or from weighing the evidence." *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012) (internal quotation marks omitted). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"When parties file cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014). Each motion continues, of course, to be reviewed

*de novo.  See*, *e.g.*, *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 & n.1 (5th Cir. 1999).

Mississippi substantive law applies to this diversity action; accordingly, our court looks to the decisions of Mississippi's highest court, and reviews decisions of its intermediate appellate court as persuasive.  *Patrick v. Wal-Mart, Inc.--Store No. 155*, 681 F.3d 614, 617 (5th Cir. 2012).  Pursuant to Mississippi law, "[q]uestions concerning the construction of contracts are questions of law that are committed to the court rather than questions of fact committed to the fact finder".  *In re Estate of Fitzner*, 881 So. 2d 164, 169 (Miss. 2003).

### A.

For the reasons that follow, Southern is not entitled to summary judgment:  its valuation condition can be construed as ambiguous; and, in the alternative, its construction of its policy engenders an unfair or absurd result.  But, as shown *infra*, this result is a pyrrhic victory for the association and Affiliated.

Under its "Loss Payment" section, Southern was to "determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition".  That condition stated, *inter alia*:  Southern would value repairs or replacement at "[n]othing" if entities other than the association covered the cost.  The two clauses, read together, form the backdrop of the dispute concerning ambiguity.

Under Mississippi law, when interpreting a contract, a court "must look to the 'four corners' of the contract whenever possible to determine how to interpret it".  *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So. 2d 107, 111 (Miss. 2005).  And, "if a contract is clear and unambiguous, then it must be interpreted as written".  *United States Fid. & Guar. Co. of Miss. v. Martin*, 998 So. 2d 956, 963 (Miss. 2008).  In other words, only when a contract is unclear

or ambiguous may a court go beyond the "four corners" to determine the parties' intent. *Facilities, Inc.*, 908 So. 2d at 111.

Accordingly, an insurance "policy must be considered as a whole, with all relevant clauses together"; but, any "ambiguities must be resolved in favor of the non-drafting party". *Martin*, 998 So. 2d at 963. "Ambiguities exist when a policy can be logically interpreted in two or more ways, where one logical interpretation provides for coverage. . . . [but] do not exist simply because two parties disagree over the interpretation of a policy." *Id.* (citations omitted).

In any event, a contract interpretation "leading to an absurd, harsh or unreasonable result . . . should be avoided, unless the terms are express and free of doubt". *Frazier v. Ne. Miss. Shopping Ctr., Inc.*, 458 So. 2d 1051, 1054 (Miss. 1984). Along that line, "[w]here a contract is silent as to one of its terms, the court is not bound to adopt a construction which is not compelled by the instrument and [to] which no man in his right mind would have agreed". *Tupelo Redev. Agency v. Abernathy*, 913 So. 2d 278, 284 (Miss. 2005).

As an initial matter, Southern's pre-litigation position is at odds with the one it took after filing this action. Southern's November 2013 claim-denial letter to the association offered a list of reasons why Southern was not required to pay for damage to the house. As noted, such reasons included, *inter alia*: the university, not the association, was contractually bound to pay for all repairs; any repair payments made by the association would be voluntary; and the association should have presented a claim to Affiliated. On the other hand, the letter did not contest the association's valuation of its claim, nor did it assert that the value of the claim was zero; Southern did not invoke the valuation provision of "[n]othing [owed] if others pay for repairs or replacement" until later in this litigation.

Were all of Southern's interpretations of its policy accepted as true, there is seemingly no circumstance where it would be compelled to pay the

association.    Permitting Southern to deny coverage because it was the university's responsibility to make repairs, or because Southern's inaction caused another insurer to step in and pay for them, essentially allows it to agree to insure the house but without assuming any risk.  On its very face, this expansive construction of the Southern policy results in a contract to which the association, "in [its] right mind", would not have agreed.  *Id.*  Nonetheless, we turn to the specific terms of the Southern policy.

Southern urges a narrow reading of its loss-payment and valuation conditions.  Again, those provisions state, in relevant part:  Southern is entitled to determine the value of lost or damaged property, and such damages will be valued at "[n]othing if others pay for repairs or replacement".  Southern asserts this ends the analysis:  the house was damaged; Affiliated paid the university for the cost of repairs; and, therefore, the value of the association's damages was "nothing" because "others" paid for the repairs.

1.

An isolated reading of these provisions supports Southern's interpretation of its policy.  As discussed *supra*, however, our review is not confined to an isolated reading of two clauses; we must consider the policy "as a whole, with all relevant clauses together", resolving any ambiguities in favor of the non-drafting party.  *Martin*, 998 So. 2d at 963.  Along that line, when read together, several other clauses in Southern's policy render the valuation provision ambiguous.

In relevant part, the valuation provision provides Southern "will determine the value of the Covered Property . . . [a]t actual cash value *as of the time of loss or damage*, except as provided in . . . [subsection] e. below".  (Emphasis added).  That subsection, pertaining to "Tenants Improvements and Betterments", has three subparts that state, *inter alia*:  (1) Southern values the loss at "actual cash value" if the association makes "repairs promptly"; (2)

it values the loss "proportionately" if the association does not make prompt repairs; but (3) it values the loss at "[n]othing if others pay for repairs or replacement". Unlike the first two subparts, which address prompt and delayed repairs, Southern's "nothing" provision does not contain any temporal limitations.

As briefly noted above, the district court, whose decision we can give no deference pursuant to our *de novo* review, contrasted the language in the "nothing" subpart with the policy's fraud provision, which permits Southern to void the policy "at any time" if fraud is discovered. Therefore, it reasoned: "Had Southern intended for the '[n]othing if others pay for repairs or replacement' section of its policy . . . to apply before *and* after a claim denial, it certainly could have included policy language to that effect". Order, *S. Ins. Co.*, 2015 WL 1636711, at *5 (emphasis in original).

Additionally, the association and Affiliated highlight a separate portion of Southern's loss-payment provision:

> We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

They contend that, contrary to Southern's assertions, "[t]his language clearly contemplates that Southern is obligated to pay for claims seeking reimbursement of damages that an 'owner' may have, but which the insured is obligated to pay". (Southern objects to the association and Affiliated's reliance on this provision, contending they impermissibly raise this contention for the first time on appeal. Although assertions raised for the first time on appeal are generally not considered, *e.g.*, *Vogel v. Veneman*, 276 F.3d 729, 733 (5th Cir. 2002), we are nonetheless required to consider the policy as a whole, pursuant to our *de novo* review, *Martin*, 998 So. 2d at 962–63.)

Reading these provisions together, it is ambiguous whether Southern may invoke its valuation provision in a situation such as here, where it: denies coverage; files an action one week later to establish the denial's legality; and does not invoke the valuation provision until that litigation is ongoing. Southern points to no decisions that permit this outcome. Although it cites to, *inter alia*, *Edgewood Manor Apartment Homes, LLC v. RSUI Indemnity Co.*, 733 F.3d 761 (7th Cir. 2013), such reliance is misplaced.

In *Edgewood*, the seventh circuit construed an insurance policy under Mississippi law, which also contained a repair-or-replacement provision: "We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement". *Id.* at 774. The *Edgewood* court explained: "This language expressly excludes recovery of replacement-cost benefits for damage to tenants' improvements and betterments *if others pay for repairs or replacement*". *Id.* (emphasis in original).

Unlike the *Edgewood* policy, however, Southern's provision does *not* expressly refuse payment; instead, it only values the loss at "nothing" if "others" pay for repairs. Moreover, as the district court persuasively noted, *Edgewood* "did not appear to encompass the factual circumstance of an insurer rejecting a claim for coverage and subsequently contending that the value of the claim is nothing because another insurer stepped in and provided benefits *after* the claim denial". Order, *S. Ins. Co.*, 2015 WL 1636711, at *6 (emphasis in original).

Accordingly, the ambiguity surrounding Southern's invocation of its valuation provision supports affirmance. This gives way, however, to a more substantial flaw with Southern's position: its interpretation of its policy leads to an unfair or absurd result.

No. 15-60472

2.

Neither Southern's loss nor valuation provisions encompass a scenario like the one at hand, where Southern is the reason for "others" paying for repair or replacement.  Southern's assertions result in a circular justification for denying coverage where:  Southern receives a proof of loss, but does not contest the valuation; it denies the proof of loss and files this declaratory-judgment action; its inaction results in another insurer's bearing the cost; and Southern uses the other insurer's payment to retroactively value the loss at zero.

Were this construction adopted, insurers who covered the same risk would be incentivized to enter into a stare-down, each waiting for the other to blink first in order to seize the opportunity to deny coverage.  Such an outcome is neither reasonable nor commercially practicable.  Accordingly, because Southern's interpretation of the policy leads to an unfair or absurd result, it was not entitled to summary judgment.

3.

Southern's related assertions concerning indemnity, assignments, and voluntary payment similarly fail.

a.

Southern avers:  its policy is one of indemnity, not liability; therefore it is obligated to pay only in the event of an actual loss.  It asserts, without pointing to any policy language, that its policy "only covers actual expenses incurred by the insured".  This broad, unsupported reading is contrary to the policy's plain language.  For example, the first line in the "Loss Payment" provision states that, "in the event of loss or damage", Southern will "[p]ay the value of lost or damaged property"; it is completely silent for whether the association need incur an "actual expense".

14

No. 15-60472

In any event, as discussed *supra*, Southern's claim-denial was the reason Affiliated paid the university for a risk Southern also insured. Southern's indemnity-versus-liability assertion is a mere repackaging of its position that it should not have to pay because the value of the association's loss is "zero".

b.

Southern attacks the sufficiency of the association's assignment to Affiliated of the association's right to recover under Southern's policy. In that regard, Southern asserted in district court that the assignment was void under its policy's anti-assignment clause. It fails, however, to adequately brief this issue on appeal, merely stating: "[The] alleged assignment [to Affiliated], which is unenforceable under the Southern policy, also provides no right to recover anything through [the association]". "[F]ailure to provide any legal or factual analysis of an issue on appeal waives that issue". *Jason D.W. ex rel. Douglas W. v. Hous. Indep. Sch. Dist.*, 158 F.3d 205, 210 n.4 (5th Cir. 1998). Moreover, as discussed *supra*, the association has a right to recover against Southern under the terms of the policy.

c.

Looking beyond the terms of its policy, Southern contends Affiliated's payment to the university excuses any obligation to pay by Southern, pursuant to the "voluntary payment doctrine". As discussed *infra*, on these facts Affiliated's payment to the university was not voluntary, because it was a contractually-obligated payment between insurer and insured.

A voluntary payment "is a payment made without compulsion, fraud, mistake of fact, or agreement to repay a demand which the payor does not owe, and which is not enforceable against him". *Glantz Contracting Co. v. Gen. Elec. Co.*, 379 So. 2d 912, 917 (Miss. 1980) (quoting *McDaniel Bros. Constr. Co. v. Burk-Hallman Co.*, 175 So. 2d 603, 605 (Miss. 1965)). Such a payment, once made, cannot be recouped. *E.g.*, *id.*

15

Under Mississippi law, a volunteer is "[a] stranger or intermeddler who has no interest to protect and is under no legal or moral obligation to pay". *Guidant Mut. Ins. Co. v. Indem. Ins. Co. of N. Am.*, 13 So. 3d 1270, 1279 (Miss. 2009) (quoting *State Farm Mut. Auto. Ins. Co. v. Allstate Ins. Co.*, 255 So. 2d 667, 669 (Miss. 1971)).   For obvious reasons, "whether a payment was compelled or made voluntarily is a highly factual determination". *Genesis Ins. Co. v. Wausau Ins. Cos.*, 343 F.3d 733, 739 (5th Cir. 2003) (applying Mississippi law).

Courts analyzing the doctrine have concluded payments were involuntary in a variety of circumstances.  *See Guidant*, 13 So. 3d at 1279–80 (settlement payment on behalf of insured with whom insurer had contractual obligation to defend not voluntary); *State Farm*, 255 So. 2d at 669 (co-primary insurer with "solemn obligation" to defend insured and make settlement payments not acting voluntarily); *Travelers Prop. Cas. Co. of Am. v. Federated Rural Elec. Ins. Exch.*, C.A. No. 3:08:CV83-DPJ-JCS, 2009 WL 2900027, at *6 (S.D. Miss. 3 Sept. 2009) (interpreting *Guidant* to "suggest that if the party seeking contribution establishes its duty to pay, it may then seek contribution for the portions of the settlement it paid on the other carrier's behalf", where two insurers "provided coverage for th[e] same risk").

On this summary-judgment record, Affiliated's payment to the university was not voluntary.  Southern and Affiliated covered the same risk for different insureds.  Although Southern denied the association's claim, Affiliated was obligated, pursuant to its policy with the university, to provide coverage for the house.  Along that line, nonpayment under that policy could have exposed Affiliated to potential liability.  Therefore, because Affiliated acted pursuant to its duty to pay, it cannot be considered a volunteer.  *Guidant*, 13 So. 3d at 1279; *State Farm*, 255 So. 2d at 669; *see also St. Paul Fire & Marine Ins. Co. v. State Volunteer Mut. Ins. Co.*, No. Civ. A. 2:97CV47-D-B, 1998 WL

173222, at *2 (N.D. Miss. 23 Feb. 1998) (holding, in subrogation context, that insurer who was legally obligated to make payments was not a "mere volunteer"), *aff'd* 212 F.3d 595, 2000 WL 423419 (5th Cir. 2000) (unpub.).

B.

Each insurer believes the other should be held solely liable for the loss payment; therefore, all parties contend:  the court erred in concluding the policies' other-insurance clauses were mutually repugnant; and, accordingly, the resulting *pro rata* loss apportionment is inappropriate.  Because, *inter alia*, the policies covered the same risk for the benefit of both the university and the association, on these facts the clauses are mutually repugnant.

The other-insurance clauses are designed to dictate priority of coverage between multiple policies.  Southern's states, *inter alia*, that, in the event of other insurance, it "will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether [the insured] can collect on it or not".  Affiliated's contains similar language, noting, *inter alia*, "this insurance will apply only as excess and in no event as contributing insurance".  Because both clauses purport to provide excess coverage, we must determine whether one policy provides primary coverage, or whether the loss must be apportioned *pro rata.*

The other-insurance provisions at issue are "excess" clauses, which "in essence, provide that, if there is other insurance available from Company B, the policy issued by Company B will be deemed the primary coverage and Company A's exposure will come into play only if the claim exhausts the policy limits of Company B's policy". *Titan Indem. Co. v. Am. Justice Ins. Reciprocal*, 758 So. 2d 1037, 1040 (Miss. Ct. App. 2000).  Where two policies contain such clauses, and each policy states it is excess to the other, a conflict exists; therefore, "the two policies are indistinguishable in meaning and intent" and the clauses "must . . . be held to be mutually repugnant and must be

disregarded". *Travelers Indem. Co. v. Chappell*, 246 So. 2d 498, 504 (Miss. 1971). In doing so, the court makes the coverage of both policies primary. *Titan*, 758 So. 2d at 1040. As discussed *infra*, in such a situation, Mississippi courts apportion loss payments between insurers *pro rata*, according to the policies' respective limits. *See, e.g.*, *Allstate Ins. Co. v. Chi. Ins. Co.*, 676 So. 2d 271, 275 (Miss. 1996).

Southern cites no relevant precedent in support of its position, chiefly reiterating that its other-insurance provision could not be triggered because it owes nothing under the policy. As held *supra*, however, Southern owes under its policy. On the other hand, the association and Affiliated contend an other-insurance analysis does not apply where there are multiple insureds, and further assert the district court erred in declining to review the lease as extrinsic evidence to determine priority of coverage.

The association and Affiliated contend our court has determined an other-insurance analysis is appropriate only when multiple policies cover the same insured. In *American States Insurance Co. v. ACE American Insurance Co.*, our court, citing the Texas Supreme Court, observed that "[c]onflicts involving other insurance clauses arise when more than one policy covers the same insured and each policy has an other insurance clause which restricts its liability by reason of the existence of other coverage". 547 F. App'x 550, 553 (5th Cir. 2013) (quoting *Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.*, 444 S.W.2d 583, 586 (Tex. 1969)) (internal quotation marks omitted). Our court reached a similar conclusion in *American Indemnity Lloyds v. Travelers Property & Casualty Insurance Co.*, noting that, under Texas law, recovery under such other-insurance circumstances is based "upon conventional or equitable subrogation to the rights of the common insured against the nonpaying insurer". 335 F.3d 429, 435–36 (5th Cir. 2003).

No. 15-60472

Mississippi courts have not squarely addressed whether an other-insurance analysis is appropriate where there are multiple insureds.  (In *American Resources Insurance Co. v. W.G. Yates & Sons Construction Co.*, C.A. No. 4:09CV181-HTW-LRA, 2012 WL 1033521, at *19 (S.D. Miss. 27 March 2012), the court, in making an *Erie*-guess, cited *American Indemnity Lloyds* with approval; however neither opinion is entitled to deference.)  Moreover, our court has not considered Mississippi law under the circumstances at issue. Accordingly, we must make an *Erie*-guess for how the Mississippi Supreme Court would decide the question.  *E.g., Keen v. Miller Envtl. Grp., Inc.*, 702 F.3d 239, 243 (5th Cir. 2012).

In *American National Insurance Co. v. U.S. Fidelity & Guaranty Co.*, a garnishment proceeding, the Mississippi Supreme Court rejected the contention that a fidelity bond provided only excess coverage to another bond. 215 So. 2d 245, 250 (Miss. 1968).  Although that case did not concern competing clauses, such as the ones at issue, the court disfavored the interpretation of the bond as providing excess coverage, because the two bonds pertained to different insureds and risks.  *Id.*  Crucially, it stated "other insurance under an excess coverage clause must affect the *same property, interest and risk* as those in favor of the insured under the primary policy".  *Id.* (emphasis added); *see also Motors Ins. Corp. v. Lamar T. Loe Motor Co.*, 223 So. 2d 539, 542 (Miss. 1969) (rejecting excess coverage where the policies "covered separate and different interests").

Courts that have considered such competing clauses have reached different results.  In *State Farm Fire & Casualty Co. v. Zurich Insurance Co.*, an equitable-contribution case, a tenant purchased liability insurance pursuant to a lease agreement.  111 F.3d 42, 43 (6th Cir. 1997).  The policies, however, did not designate the building owner as a named or additional insured.  *Id.*  Following a personal-injury claim, the tenant's insurers settled,

19

and subsequently sued the building-owner's insurer for contribution. *Id.* at 44. In rejecting the tenant's insurers' assertions, the sixth circuit held the triggering of other-insurance provisions in order to receive contribution was inapplicable "where two insurance policies insure the same property but *different insureds*". *Id.* at 45 (emphasis added); *Northbrook Prop. & Cas. Ins. Co. v. W. Am. Ins. Co.*, 1 F. App'x 268, 272 (6th Cir. 2001); *see also Fireman's Fund Am. Ins. Cos. v. Turner*, 488 P.2d 429, 436 (Or. 1971) ("[I]f the two policies do not cover the same insured, there can be no repugnancy with respect to the 'other insurance' clauses".).

But, in *Burns v. California Fair Plan*, the California Court of Appeals reached a different result. 61 Cal. Rptr. 3d 809 (Cal. Ct. App. 2007). There, two insureds obtained separate policies for the same building, which was lost in a fire. *Id.* at 811. In construing the policies' other-insurance provisions, the court took an opposite approach from the sixth circuit, noting:

> Where, as here, two insurance policies apply to the same risk, the relative application thereof is generally determined by the explicit provisions of the respective other insurance clauses. . . . This is true even where the policies cover different insureds. The fact they cover the same risk makes the insurers coinsurers as to that risk.

*Id.* at 816–17 (emphasis, internal quotation marks, and citations omitted); *see also In re Popkin & Stern*, 340 F.3d 709, 716 (8th Cir. 2003) (interpreting Missouri law and noting "as a general rule, when two insurance policies cover the same risk and contain closely similar 'other insurance' clauses, the clauses are not enforced"); *Cheektowaga Cent. Sch. Dist. v. Burlington Ins. Co.*, 822 N.Y.S.2d 213, 215 (N.Y. App. Div. 2006) ("The general rule is . . . that where there are multiple policies *covering the same risk* . . . the excess coverage clauses are held to cancel out each other". (Emphasis added and internal quotation marks omitted)).

No. 15-60472

1.

In the light of the above-cited authority, we hold:  under these facts, the policies' other-insurance clauses are mutually repugnant.  As discussed *supra*, both clauses treat their respective policies as providing excess coverage.  Moreover, and crucially, both policies cover the identical risk:  property damage to the house.

In short, the association and Affiliated's assertion that an other-insurance analysis is inappropriate where the policies cover multiple insureds is unpersuasive.  As noted above, in order for an insurance policy to provide excess coverage to another policy, Mississippi courts require both policies cover "the *same property, interest and risk*".  *Am. Nat'l Ins. Co.*, 215 So. 2d at 250 (emphasis added).  Here, although there are different insureds, the property, interest, and risk are identical:  both policies insure the house for property damage, to the mutual benefit of the association and the university.  Such a scenario compels holding there is mutual repugnance.

To hold otherwise under these facts would be illogical.  Similar to the above discussion concerning the absurdity of Southern's policy interpretation, were the clauses held not mutually repugnant, insurers who covered the same risk for different insureds would be incentivized to take no action, out of fear that they would bear the entire loss.  Practically speaking, such a result makes no sense.

2.

In the alternative, the association and Affiliated contend the district court erred in refusing to consider the lease between the university and the association as extrinsic evidence when interpreting the policies.  Again, because our review is *de novo*, we can afford the court's opinion no deference.  Nonetheless, and particularly in the light of the above analysis, there is no reason to consider the lease when interpreting the policies.

21

No. 15-60472

"Under Mississippi law, the construction of an insurance contract is limited to examining the policy. . . . The policy itself is the sole manifestation of the parties' intent, and no extrinsic evidence is permitted absent a finding by a court that the language is ambiguous and cannot be understood from a reading of the policy as a whole." *Am. States Ins. Co. v. Natchez Steam Laundry*, 131 F.3d 551, 555 (5th Cir. 1998) (internal quotation marks and citation omitted). In brief, nothing about the other-insurance clauses in either policy is ambiguous. As noted *supra*, both clauses are typical excess clauses, each simply stating their policy would not be considered primary insurance.

Furthermore, even assuming *arguendo* the lease should be considered, its language does not illuminate which policy is intended to be primary. The lease's insurance clause states, *inter alia*, that "[t]he . . . [a]ssociation will, at its own expense . . . keep in force for the mutual benefit of the . . . [a]ssociation and [the university], general public liability insurance". Further, it states: the university "is the sole owner of [the house], however, the . . . [a]ssociation shall insure [the house] for any and all perils, including, but not limited to, fire, etc.". None of the above-quoted language establishes priority of coverage, and the association and Affiliated's related assertions are inapposite.

For all of these reasons, we hold: on this record, a *pro rata* approach is appropriate. Therefore, we must determine the proper loss allocation under that basis.

## C.

As discussed *supra*, under Mississippi law, when other-insurance provisions are found to be mutually repugnant, payments under the policies are pro-rated according to the coverage limits of each policy. *E.g.*, *Chi. Ins. Co.*, 676 So. 2d at 275. Here, in determining the *pro rata* calculation, the court determined the limits of the Southern and Affiliated policies were $4,112,000 and $500 million, respectively. Applying those limits against the association's

stated loss of $3,080,932.36, the court ruled Southern was liable for $25,337.58, with Affiliated's being liable for the remaining $3,055,594.78.  The association and Affiliated contend this calculation was improper:  claiming Affiliated's insured, the university, had a "scheduled" policy, they maintain the applicable coverage limit for the house under that policy was $3,962,662 (again, the house's scheduled value), not the blanket $500 million policy limit.

"Blanket" and "scheduled" policies are terms of art.  *See Reliance Ins. Co. v. Orleans Par. Sch. Bd.*, 322 F.2d 803, 806 (5th Cir. 1963) (applying Louisiana law).  A blanket policy "is one that invariably covers and attaches to every item of property described therein"; a scheduled, or specific, policy "allocates the amount of the risk in stated values upon the several items embraced in the coverage".  *Id.* at 805–06 (internal quotation marks omitted).

Along that line, our court concluded in *Reliance* that, *inter alia*, the mere existence of a statement of values for individual buildings, without more, did not establish a scheduled policy.  *Id.* at 807.  Other circuits have reached similar conclusions.  *See First Centrum Corp. v. Landmark Am. Ins. Co.*, 237 F. App'x 799, 802 (4th Cir. 2007) (policy was scheduled because it clearly stated scheduled limits applied); *Knowlton Specialty Papers, Inc. v. Royal Surplus Lines Ins. Co.*, 112 F. App'x 121, 122 (2d Cir. 2004) (accompanying endorsement made "clear that the coverages are scheduled rather than blanket").

Mississippi courts have not addressed the differences between a blanket and a scheduled policy; however, as the district court noted, the Southern District of Mississippi has previously encountered this issue.  In making an *Erie*-guess whether, under Mississippi law, an insurer's liability for building damage was capped at a scheduled sub-limit, the court in *Gulfport-Brittany, LLC v. RSUI Indemnity Co.* observed:

No. 15-60472

> [C]ourts in other jurisdictions have determined that where a policy contains a scheduled limit of liability endorsement, and the description of the premises is listed as per schedule on file with the company, a scheduled—rather than blanket—policy is created, and the insurer's liability as to that particular property is limited to the value shown on the statement of values on file with the company.

C.A. No. 1:07CV1036 HSO-JMR, 2008 WL 4951468, at *3 (S.D. Miss. 7 Nov. 2008), *aff'd* 339 F. App'x 413 (5th Cir. 2009).  Accordingly, the *Gulfport-Brittany* court concluded that, because the policy at issue contained an unambiguous scheduled limit-of-liability endorsement, the overall blanket limit did not apply, and the insurer's property-damage liability was capped at the amount scheduled in the policy.  *Id.* at *4–5.

As the district court correctly noted in this matter, although Affiliated's policy has a schedule of the individual buildings and their values, the policy does not contain a scheduled limit-of-liability endorsement. The Affiliated policy's declarations page provides only:  "This company's liability will not exceed the respective Sub-Limits of Liability shown elsewhere for the coverages involved".  Those sub-limits, however, do not pertain to the value of individual buildings; rather, they cap recovery for certain types of damages, such as floods.

Moreover, in its response to Southern's request for admissions, Affiliated stated:  its policy did not contain a sub-limit of liability with respect to real property; and, its policy did not contain a sub-limit of liability for the house. The association and Affiliated provide no basis, apart from appealing to understandable and compelling equitable concerns, for why those scheduled values should control.  Those concerns cannot carry the day.  Therefore, in making our *Erie*-guess, the district court's above-discussed analysis for this

24

No. 15-60472

issue is persuasive; and its *pro rata* calculation provides the correct allocation of liability.

## III.

For the foregoing reasons, the judgment is AFFIRMED.